[No. 28118. Department Two. March 17, 1941.]

AGNES SUMERLIN, *Respondent,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Defendant,* OZETTE RAILWAY COMPANY, *Appellant.*[1]

[1]Reported in 111 P. (2d) 603.

44

*L. B. Donley,* for appellant.

*Harry Ellsworth Foster* and *A. D. Gillies,* for respondent.

JEFFERS, J.—This is an appeal by the Ozette Railway Company, a corporation, employer and intervener, from a judgment made and entered in the above-entitled proceeding, June 7, 1940, after a jury verdict in favor of plaintiff and respondent had been received and entered, and after motions for new trial and for judgment notwithstanding the verdict had been made by intervener and denied by the court.

The judgment entered reversed a decision of the joint board of the department of labor and industries, hereinafter referred to as the department, dated April 17, 1939, affirming an order of the supervisor rejecting respondent's claim, and remanded the cause to the department, with instructions to allow respondent's claim for the death of her husband and to pay the compensation allowed by law.

William Sumerlin, husband of respondent, died on July 23, 1936, while in the employ of appellant as a timber faller. On August 6, 1936, respondent filed a claim for pension as the widow of the deceased, and on October 22, 1936, the supervisor of industrial insurance rejected the claim, for the reason that there was no proof of an injury to William Sumerlin during the course of employment, and his death was not the result of trauma, but of a preexisting disease.

On November 4, 1936, respondent filed a petition for rehearing before the joint board, which was granted November 23, 1936, and thereafter, on May 26, 1937, and on various other dates up to and including March 21, 1939, to which date the hearing was continued, testimony was taken as hereinafter set forth.

The testimony of the following lay witnesses was

offered by respondent: Mrs. Agnes Sumerlin, W. A. Thompson, Guy Sansom, George H. Northup, Dale Northup, Sr., Marvin Carter, Len Forrest, Herbert Hulten, and Earl C. Sansom, or Lee Sansom, as he was called.

Mrs. Sumerlin testified that she and Mr. Sumerlin were married in 1917, and had one son eighteen years of age; that, at the time of his death, her husband was a timber faller, in the employ of appellant; that Mr. Sumerlin was forty-eight years of age, had always been a strong, robust man, and had never had a doctor; that deceased was very active and had always done hard work; that her husband had worked for the Bloedel-Donovan Company as a faller for about a year before going to work for appellant, and had been working for appellant about two weeks.

W. A. Thompson testified that deceased was a strong, able-bodied man; that the witness, with Lee Sansom and Dale Northup, went out to the place where Mr. Sumerlin was working at the time of his death, and Dale took some pictures (marked as claimant's exhibits A, B, C, and D); that the pictures show the stump of the tree on which deceased last worked and the conditions immediately adjacent to the stump. Dale Northup testified to taking the pictures above referred to.

Mrs. Sumerlin, W. A. Thompson, Guy Sansom, George Northup, and Dale Northup, each related a conversation they had with Lee Sansom, who was working with Mr. Sumerlin the day of his death, in which Mr. Sansom told them what happened just prior to Mr. Sumerlin's death, particularly what deceased did and how he acted. Objection was made to the admission of this testimony at the time it was given before the examiner, and the trial court sustained the objection, on the ground that it was hearsay. Guy

Sansom was permitted to testify to the customary method which a timber faller used in getting down from a spring board. The witness stated that he either jumped down or swung down, depending upon the formation of the ground and a lot of different things.

Marvin Carter, who was called by both respondent and appellant, testified that he was a scaler for Polson Logging Company, and knew deceased; that on July 23rd he was checking and scaling for appellant close to where Mr. Sumerlin was working; that deceased and Lee Sansom had cut timber that day that scaled 46,000 feet; that the last tree worked on by deceased measured five feet ten inches in diameter; that, after this tree was felled, the witness went over to mark and scale it, which probably took him fifteen or twenty minutes; that, after having finished his work on the tree and having been told by Sansom that Sumerlin was feeling sick, he went up to where Sumerlin was, which was four or five hundred feet from where the tree had been cut, and asked Sumerlin how he felt, to which the latter replied that he was feeling better; that he did not again see Sumerlin alive; that it was probably forty-five minutes or so after the tree fell before Sumerlin died.

The witness further testified that the wind was not blowing that day; that wedges were not used in falling this tree; that there were no long splinters in the stump, and that it was not a hard tree to fall; that Sansom and Sumerlin were good fallers, but that they were taking it easy.

Len Forrest, safety engineer for appellant, who was also called both by respondent and appellant, testified that he took a statement from Lee Sansom on July 28, 1936. This statement was signed by Sansom, and is a part of the records of the department.

Herbert Hulten testified he was working for Pol-

son Logging Company on July 23, 1936, near where Sumerlin was working; that they ate their lunch together that day, and he did not notice anything wrong with Sumerlin at that time; that he saw Sumerlin again about quitting time at the same place, and Sumerlin looked pale; that he asked Sumerlin what the trouble was, and Sumerlin answered that "he was feeling kind of warm," and that "he would be alright in a few minutes as soon as he got cooled off a little."

We now come to the testimony of Earl C. Sansom, known as Lee Sansom, which was taken at a continued hearing held on March 19, 1938, at the United States veterans hospital at American Lake. Prior to the taking of Sansom's testimony, objection thereto was made by appellant, on the ground that Sansom was incompetent to testify. Letters of guardianship were introduced, which show that, on June 16, 1937, on the application of People's Bank & Trust Company, that institution was appointed guardian of Earl C. Sansom, incompetent. No other part of the guardianship proceedings was introduced in evidence, so it does not appear, other than as above indicated, for what purpose or on what ground a guardian was appointed.

Prior to the taking of Sansom's testimony, the department called Dr. John D. Morgan, who testified that he was a physician and surgeon, and the attending physician at the veterans hospital, at American Lake, and had under his care Earl C. Sansom; that Mr. Sansom had a mental ailment which caused him to be incompetent at that time and socially inadaptable to be outside the hospital. The doctor further testified that, in his opinion, Mr. Sansom was not competent to testify to facts which had occurred in the past two or three years, and that, from present appearances, Sansom probably would never be competent to testify.

Earl C. Sansom was then called, and after being sworn, testified as follows:

"Q. Give your name? A. Earl C. Sansom. Q. You are commonly called Lee Sansom? A. E. L. Sansom. Q. You know Bill Thompson here? A. I am acquainted with Bill Thompson. Q. And Mrs. Sumerlin? A. I am acquainted with Mrs. Sumerlin. Q. Did you work with Archie Sumerlin in 1936? A. Archie and I have been acquainted for a long time. Q. Did you fall timber with him? A. Yes. Q. For what company did you work last with Archie Sumerlin? A. We were working for the Polson Lumber Company."

It may be stated here that, while it is not clear just what relation existed between the Ozette Railway Company and Polson Logging Company, apparently the railway company was owned and controlled by the logging company, and because of this fact the names are used interchangeably by some of the witnesses throughout this record.

The testimony of Mr. Sansom continues:

"Q. How long did you work with him the last time? A. I think we were working together a couple of weeks. Q. Do you remember the day Archie Sumerlin died? A. Well I remember that. Q. You were working with him then, were you? A. I was, yes, at that time. I been acquainted with him ever since. Q. Prior to that day, Lee, what would you say as to Mr. Sumerlin keeping up his end of the work? Did he always do his work? A. He always did his work. Q. Was he a good timber faller? A. Yes. . . .

"Q. Mr. Sansom, will you tell us in your own way what happened on the day of Mr. Sansom's [Sumerlin undoubtedly meant] death? A. Well he was all right. He was healthy apparently in every way. Q. How many trees did you fall that day? A. We were working in large timber and I think we fell two trees that day, two or three—I would not know for sure to be exact—I would say two. Q. Do you know whether it was spruce or fir that you were working on at the last? A. The last tree we were working on was spruce. Q.

Do you remember whether you wedged the tree over? A. No the wind was blowing that day. Q. Just before the tree broke from the stump, if it did, did Mr. Sumerlin say anything to you? . . .

"A. We sawed the tree through and of course we were both sweating a little because we were that way. We were sweating and we were hurrying along to keep the tree from splitting owing to the fact that there was a moderate wind blowing—there was some wind and we was trying to saw it up fast and we were trying to keep it from making a slab out of it. We had it pretty well cornered. We had it cornered on his side and cornered on my saw and I think we were sawing the center of the log. Q. What do you mean by cornered? A. Cornered up the undercut. Q. With the saw? A. With the saw. Q. You saw from one side towards the center? A. Yes from one corner and work across to the break and then we have to make kind of an angle. Q. You had this one pretty well cornered? A. We had it pretty well cornered. We had it cornered on his side but on my side it was not and we were hurrying to keep it from splitting up and breaking but at any rate there came a puff of wind and it broke and we left the saw on the stump and I swung around the stump. I did not jump down off the board. I put my hands in the kerf and kind of swung around the stump and he jumped down and jumped on a root and kind of fell and bent over like that and kind of groaned—made a noise you know and went over and sat down on a windfall over there and in a minute or so after that, the scaler was there too—a man by the name of Don—I don't know his other name. . . .

"Q. What did he say, if anything, after he jumped? A. He did the same thing I did shortly after that. Q. What was that? A. He grabbed his side and that was all but I came out of it and he did not. Q. Why did he jump from the springboard to the ground? A. He was hurrying away from the stump of the tree as he usually did. Q. Why was it necessary, if it was, for him to hurry this time? A. The tree did crack. It did split but I hung with it behind the stump. . . .

"Q. How high was the springboard from which Sumerlin jumped to the ground? A. I don't know—

about so high. Q. How tall are you? A. I am five foot eight. Q. You indicated a few inches over your head? A. That was over my head. Q. Between five foot eight and six feet? A. Yes, all of that. . . .

"Q. With reference to the saw, what was done, if anything, about the saw? A. We packed the saws to where our lunch pails was. We made one or two stops between where we felled the last tree and I fanned him you know and I tried to keep his respiratory forces working to keep him breathing—that's the only thing I could think of doing. . . .

"Q. How had Archie worked on the last tree you felled? A. He was working good. He was normal all the time. Q. Did he seem to be normal until he jumped from the spring board and hit the root? A. Yes. Q. Did he carry on his work in a normal way? A. Yes, he did. Q. After he jumped from the springboard and hit that root was he ever normal again? A. Apparently he was not you know—well he kind of, I don't know faded out and came back again. Thats the way it appeared to me. Q. How long was it after he jumped from the springboard before he died? A. It was not very long. I could not say exactly how long. . . . Q. How long do you think it was from the time Archie jumped or left that springboard until he died, how many minutes? A. Oh, I would say twenty minutes or somewhere around there."

On cross-examination by Mr. O'Neill, the witness further testified that the tree they were working on was twenty-eight or thirty inches through; that the only time Sumerlin appeared to him was when Sumerlin left the springboard as the witness swung around the stump; that Sumerlin left the springboard first. Considerable stress is placed on the following testimony of Sansom, given on cross-examination by Mr. Donley, as tending to show the incompetence of Sansom:

"Q. Did you have a bad spill too about that time and took hold of your side shortly after that? That was on the way out? A. A few days after—after that

I stayed on a few days and I couldn't understand why he should do that you know and it bothered me all the time. He was a great big strong man and I could not understand it and I can't understand it yet. Maybe it was too much smoke. I started smoking again. I left off smoking for eight months and then I started in again and that probably might have had something to do with it—with his case. I went over there after that and made a trip to town some time after that, I don't know just how long a time it was afterward and I met with my Waterloo over there in Polson's office and they brought me over here but I come out of it again but it just kept after me. There was something around my head and it wrapped around me and it hit me here just like that."

While it may be admitted that it is difficult, if not impossible, to connect the last part of the witness's answer with the question, we are of the opinion the first part of the answer, as to the witness's smoking, may refer to his condition and the reason for his holding his side, and that he thought that might have been the reason for Sumerlin's condition.

At this point, appellant moved to strike the testimony of the witness, but the motion was denied.

Dr. Morgan was again called, and testified that, in his opinion, it was impossible to tell what part of Sansom's testimony was reliable and what part was not, as it was apparent that at times Sansom's mind was wandering. However, the doctor was not familiar with the circumstances, so he could not tell whether Sansom was or was not giving a coherent account of what happened.

On redirect testimony, the witness Sansom was shown the picture hereinbefore referred to as claimant's exhibit A, and he testified that he recognized the stump and himself in the picture.

The report of the autopsy on the body of Mr. Sumerlin, conducted by Drs. Stevenson and Calhoun, in Ho-

quiam, on July 24, 1936, was admitted as claimant's exhibit F. This report shows in part:

"The abdomen was opened and all organs explored. The stomach, intestines, liver, spleen, and kidneys were all normal and there was no evidence of any peritoneal inflammation.

"The skull was not entered.

"ANATOMICAL DIAGNOSIS:

"(1) Extensive auortitis.

"(2) Extensive coronary artery disease.

"(3) Thrombosis of anterior descending branch of left coronary artery.

"CAUSE OF DEATH:

"Thrombosis of left coronary artery."

Drs. Calhoun, Riley, Drtina, and Wilson, called by the department, in answer to a hypothetical question, which included the statements contained in the autopsy report and the other facts herein set out relative to the acts of Mr. Sumerlin prior to his death, testified that, in their opinion, there was no causal connection between the exercise Mr. Sumerlin might have taken immediately before his death and the thrombosis which caused his death. Dr. E. B. Riley was asked: "What is a thrombosis?" to which he replied:

"A thrombosis is a solid coagulation formed in the circulating blood by the changes of the blood itself and a thrombosis is the occurrence of such changes."

All of the doctors above mentioned testified that a thrombosis would be more apt to form when the body is not active, because when the body is inactive the flow of blood through the blood vessels is slowed down, and it is the slowing down of the blood stream that has a tendency to produce the condition known as thrombosis.

On the other hand, Drs. Von Puhl, Goodnow, Partlow, Lingenfelter, and Broz testified, in regard to the same state of facts, that, in their opinion, the strain

or exercise of Mr. Sumerlin had a direct influence in causing the coronary thrombosis and subsequent death of Mr. Sumerlin. Dr. Von Puhl, who testified that his practice was limited to diseases of the heart, did not agree with the doctors who testified for the department, that coronary thrombosis takes place during the hours of rest and sleep, but stated that it is more apt to occur during activity. Dr. Lingenfelter testified that, while a thrombosis may gradually form, a large percentage of cases of death follow a sudden exertion which makes an increase in the coronary circulation at the time, and the heart is not able to take care of it.

Dr. Broz, who testified that he was the medical director of the out-patient department of Harborview hospital, and saw on an average of one hundred twenty cases a week, of which probably thirty were heart cases, in answer to the following question by Mr. Donley: "Isn't it a fact that—you believe there is a relationship between exercise and coronary thrombosis?" answered: "Yes; without reservation."

It may be stated that, while Dr. Partlow, in his direct examination, stated that, in his opinion, the exertion of Sumerlin had nothing to do with the coronary thrombosis, however, on redirect examination he stated that the position Sumerlin assumed in jumping or falling could have accounted for it. It may be stated generally that all of these doctors are experienced physicians and surgeons, and while it may be that some of them have had more experience in connection with heart ailments than others, they were all undoubtedly qualified to give an opinion on the question presented to them.

There was also some other testimony introduced by appellant tending to refute some of the testimony given by Sansom, principally to the effect that the

wind was not blowing on the day in question; that the stump last worked on by Sumerlin did not split; and that a man working on one side of a tree as large as the one Sumerlin and Sansom were working on could not see a man on the other side.

Appellant claims the court erred in admitting the testimony of Earl C. Sansom; in not withdrawing the cause from the consideration of the jury; in denying the motion for new trial; in entering judgment on the verdict; in giving instruction No. 16 to the jury; and in not dismissing the appeal for want of jurisdiction.

We shall first discuss the question of whether or not Sansom was competent to testify. A considerable portion of his testimony has been set out, for the reason that he was the only person who saw Sumerlin and knew what he was doing prior to his death, and for the further reason that we think his answers show a clear conception and recollection of the events to which his testimony relates, in so far, at least, as the acts of Sumerlin were involved.

While appellant admits the general rule that, where the trial court has an opportunity to see and observe a witness, the question of his competency to testify is a matter within the discretion of the trial court (citing *Czarecki v. Seattle & S. F. R. & N. Co.*, 30 Wash. 288, 70 Pac. 750), yet appellant contends the rule should not apply under the facts in this case, where the trial court did not see the witness, and especially in view of the testimony of Dr. Morgan as to his competency. The only statute we have relative to this matter is Rem. Rev. Stat., § 1213 [P. C. § 7724], which provides that a person of unsound mind shall not be competent to testify, but in the case of *State v. Hardung*, 161 Wash. 379, 297 Pac. 167, we had occasion to refer to and construe this statute, and we therein stated:

"While it is true we have a statute which declares that a person of unsound mind is not competent to testify (Rem. Comp. Stat., § 1213), the statute itself offers no definition of the term 'unsound mind.' Nevertheless, we think it must include those persons only who are commonly called insane; that is to say, those suffering from some derangement of the mind rendering them incapable of distinguishing right from wrong. It cannot include within its terms the mere ignorant or uneducated, nor those who are incapable of receiving all of the impressions within the comprehension of those more commonly gifted. In other words, the statutory term refers to those who are without comprehension at all, not to those whose comprehension is merely limited."

See, also, 28 R. C. L. 451, where the statement is made that the more recent decisions hold that a lunatic, or a person affected with insanity, is competent as a witness if he has sufficient understanding to appreciate the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard, in reference to the question at issue.

It is true that a guardian was appointed for Earl Sansom, under Rem. Rev. Stat., § 1565 [P. C. § 9897], but such a proceeding is entirely different from a proceeding under Rem. Rev. Stat., § 6930 [P. C. § 2827], to have a person adjudged insane. In so far as this record shows, Sansom has never been adjudged to be insane, and it does not appear for what purpose a guardian was appointed for him.

The trial court and the jury had the testimony of Sansom. Neither the trial court nor the jury was bound to believe the testimony of Dr. Morgan, but, in our opinion, the trial court in the first instance had a right to take into consideration this testimony, as well as the other facts, in determining whether or not Sansom was competent to testify. We are not prepared to say, after a careful consideration of this testimony, that

the court erred in holding Sansom was competent to testify.

█ In addition to what we have said, it might be added that the court gave the jury the following instruction:

"You are instructed that an incompetent person is competent to be a witness if he has sufficient mind to understand the nature and obligation of an oath and correctly to receive and impart his impressions of the matters which he has seen or heard in reference to the questions at issue, you being the judge exclusively of the weight to be given to his testimony and the credibility of him as a witness."

No exception to this instruction was taken, and it became the law of the case. *Frich v. Department of Labor & Industries,* 169 Wash. 282, 13 P. (2d) 67.

█ Did the court err in not withdrawing the case from the consideration of the jury, or in denying appellant's motion for judgment notwithstanding the verdict?

Appellant contends the record shows no unusual exertion or strain on the part of Sumerlin, prior to his death, and that his death was from natural causes; that there was substantial medical testimony to support the ruling of the joint board that death was from natural causes. Appellant admits that there is a conflict in the medical testimony, but contends the weight thereof is to the effect that there was no causal connection between the alleged exercise immediately preceding death and the heart attack which immediately preceded death. Appellant further states that this court has repeatedly held that, on a medical question at least, the decision of the joint board will not be disturbed when supported by substantial medical evidence, citing *Kavaja v. Department of Labor & Industries,* 126 Wash. 284, 218 Pac. 196; *Eyer v. Department of Labor & Industries,* 1 Wn. (2d) 553, 96 P. (2d) 1115; *Ivey v. De-*

*partment of Labor & Industries,* 4 Wn. (2d) 162, 102 P. (2d) 683; *Fain Drilling Co. v. Deatherage,* 179 Okla. 409, 65 P. (2d) 1212; and *Atlantic Refining Co. v. Allen,* 185 Okla. 194, 90 P. (2d) 659.

Appellant further contends that, before the trial court may submit the issue raised on appeal by a claimant from an adverse joint board ruling, the court must first determine whether or not, in questions of medical science, the findings of the joint board are reasonably supported, and if such findings are so reasonably supported, they shall not be disturbed. We are of the opinion counsel for appellant is mistaken in his application of the rule relative to the duty of the trial court to submit the cause to the jury if there is substantial evidence to sustain the joint board, where the case is tried to a jury. While perhaps not stated in the exact language of counsel in the instant case, the contention was made in the case of *Alfredson v. Department of Labor & Industries,* 5 Wn. (2d) 648, 105 P. (2d) 37, that the court should have determined from the record whether the evidence submitted at the hearing conducted by the joint board overcame the *prima facie* presumption as to the correctness of the order of that board, and we therein stated:

"That, however, is not the function of the court. The presumption of the correctness of the joint board's findings is for the consideration of the jury under proper instructions. The court, of course, may pass upon the sufficiency of the evidence to take the case to the jury. If the evidence introduced at the hearing before the joint board offers room for *a difference of opinion in the minds of reasonable men,* then the case must be presented to the jury." (Italics ours.)

We are of the opinion, in view of the conflict in opinion of the doctors as to the cause of death, and in view of the other testimony in this case, reasonable men might well differ as to the correctness of the order of

the joint board, and therefore that the court properly submitted the case to the jury.

In the case last cited, we further stated:

"We hold that the presumption accorded to the findings of the joint board lost its force and effect when the jury decided the questions of fact which were presented to it. The verdict of the jury in such cases, *when based upon substantial evidence,* forecloses a further consideration of the presumption accorded to the order of the joint board." (Italics ours.)

There is no question in our minds but that there was substantial evidence sufficient, if believed by the jury, to support the verdict, and it follows that the motion for judgment notwithstanding the verdict was properly denied. See, also, *Darling v. Department of Labor & Industries,* 6 Wn. (2d) 651, 108 P. (2d) 1034.

We are also satisfied that it is not now necessary to show that death of one engaged in extrahazardous employment was caused or contributed to by an unusual exertion or strain, but that

"An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, *whatever the degree of exertion or the condition of the workman's health.*

"To say now that some unusual effort or strain is necessary to render death compensable, would not only be in direct conflict with the plain and emphatic language of our holdings, but would also introduce an element of uncertainty and confusion, in that every case would present a problem as to the standard to be used in determining whether or not, in a given instance, the exertion was unusual, and whether or not the workman was expending only the ordinary exertion required in a particular line of employment." *McCormick Lumber Co. v. Department of Labor & Industries,* 7 Wn. (2d) 40, 108 P. (2d) 807.

■ It is next contended that the court erred in giving instruction No. 16, for the reason that it is incomplete, and that, under any theory of the case, the court in such instruction should have told the jury that, if the decision of the joint board is reasonably supported by the evidence, their verdict should be for the defendant.

We think it apparent from what we said in the *Alfredson* case, *supra,* that, if an instruction had been given as suggested by appellant, it would have constituted error on the part of the trial court. It does not appear that any instruction was prepared by appellant on this matter. By the instruction as given, the jury were informed that, in all appeals from decisions of the department of labor and industries, the decision of the department is presumed to be correct—that is, it is *prima facie* correct—and the burden is upon the party attacking the order to prove, by a preponderance of the evidence, that the decision of the department was wrong, and that, unless respondent proved by a preponderance of the evidence that her husband died as the result of an injury, the jury's decision must be for the defendant, for the burden was not on the department to disprove respondent's claim.

While the instruction might have been differently phrased, we think it properly stated the law relative to the degree of proof required of a plaintiff in a case appealed from the joint board, which requires only that the verdict be supported by substantial evidence. *Alfredson v. Department of Labor & Industries, supra.*

■ It is finally contended that the court erred in not dismissing the appeal from the decision of the joint board, for want of jurisdiction. This assignment is based upon the record, which shows that, at the close of the continued hearing, on December 15, 1938, counsel for respondent stated that he rested. Thereafter, on December 30th, the joint board made and entered an

order sustaining the action of the supervisor. On January 11, 1939, counsel for respondent requested by letter that the department withdraw its order of December 30th, and continue the matter to afford respondent an opportunity to recall Dr. Partlow. Mr. Foster's letter to the department states:

"Upon returning to my office at the conclusion of the last hearing in this case I called the department and requested a further continuance. I understand that the notation was made on the file but overlooked. For that reason request is made that you withdraw the final order dated December 30, 1938, and afford me an opportunity of recalling Dr. Partlow in Olympia for further testimony."

On January 16, 1939, the joint board entered an order as follows:

"Following the joint board's order of December 30th, 1938, sustaining the supervisor's action concerning the claim a request was made of the joint board by the claimant's attorney Mr. Harry Ellsworth Foster that the final order dated December 30th, 1938, be withdrawn since Mr. Foster had earlier made an oral request for a continuance *prior to the entree of the joint board's order of December 30th, 1938.* That Mr. Foster desired an opportunity of recalling Dr. Partlow for further testimony. *An investigation of the matter discloses that such oral request was received for further continuance prior to the submission of the case to the joint board, but overlooked.* The joint board therefore concludes that the joint board's order of December 30th, 1938, should be withdrawn and an opportunity afforded the petitioner of further testimony as requested." (Italics ours.)

While it is true that counsel for appellant, on February 3, 1939, after receipt of notice of the action of the joint board, by letter to the department, questioned the right of the joint board to reopen the case, the record further shows that on March 21st, the date to which the hearing was continued, all parties were present, in-

cluding counsel for appellant, and no objection was made to proceeding, for the purpose of taking the testimony of Dr. Partlow. The joint board's final order was made on April 17, 1939.

Appellant cites several cases to sustain its contention, among them *Albrecht v. Department of Labor & Industries,* 192 Wash. 520, 74 P. (2d) 22, quoting therefrom as follows:

"It is true that there may be successive rehearings before the joint board, but not on the same question. Where there is a second rehearing before the joint board, it is on an entirely different question—not on a question previously presented."

In the first place, it is our opinion that respondent did not ask for, and the joint board did not grant, a rehearing in this case, as that term is used in Rem. Rev. Stat., § 7697 [P. C. § 3488], or any other section of the workmen's compensation act, but that what respondent asked for, and the department granted, was a withdrawal of the order entered and a further continuance of the original hearing. In order to grant this further continuance, it, of course, became necessary to withdraw the order made on December 30th, and this appellant contends the joint board had no authority to do.

It is apparent that the order of December 30th was entered by mistake, it appearing that counsel for respondent, before the entry of such order, had made a request for a further continuance for the purpose of further interrogating Dr. Partlow, and that the department had made a notation of such request on the files, but had overlooked this notation and inadvertently entered the order of December 30th. We are satisfied that the department, under the general powers granted to it, has the right, for reasons which appear to the department to justify such action, to withdraw an order made and entered by it, provided such withdrawal is

made before the time for appealing from such order has expired, or to correct any order so entered to actually conform to the record, and this court will not reverse the action of the department in so doing, except for arbitrary and capricious action. See *State ex rel. Hills v. Olinger,* 193 Wash. 365, 75 P. (2d) 926.

We also desire to call attention to a part of Rem. Rev. Stat., § 7679 [P. C. § 3472], which reads:

"Provided, however, That if within the time limited for taking an appeal from an order closing a claim, the department shall order the submission of further evidence or the investigation of any further fact, the time for appeal from such order closing the claim shall be extended until the applicant shall have been advised in writing of the final order of the department in the matter."

The order of the joint board withdrawing its order of December 30th was made on January 16th, which was before the time for appealing from the order of December 30th had expired. We are of the opinion the time to appeal did not begin to run until the entry of the order of April 17, 1939, and the notice of appeal given on April 26, 1939, was therefore timely given, and the court had jurisdiction. We do not wish to be understood as departing from the rule announced in the *Albrecht* and the other cases cited by appellant, being of the opinion that those cases are distinguishable from the instant case and not controlling herein.

We therefore conclude that the trial court was justified in submitting this case to the jury; that the verdict of the jury was based upon substantial evidence; and that the court was justified in denying the motions for judgment notwithstanding the verdict and for new trial, and in entering judgment on the verdict.

The judgment of the trial court is affirmed.

ROBINSON, C. J., BEALS, MILLARD, and SIMPSON, JJ., concur.