[No. 233-40902-1.    Division One.    April 13, 1970.]
Panel 2

RITA McCUTCHEON, *as Guardian, et al., Respondents,* v. RITA
BROWNFIELD, *Appellant.*

*Clay Nixon,* for appellant.

*Frederick P. Holbrook* and *Eleanor Edwards,* for respondent.

HOROWITZ, A. C. J.—Defendant, Rita Brownfield, appeals from a judgment setting aside a deed to her from the plaintiff, Grace Sandell, on the ground of undue influence. The basic question raised is whether substantial evidence supports the findings, conclusions and judgment. For convenience, we shall on occasion refer to Mrs. Sandell as the plaintiff, although a guardian and then a successor guardian were later substituted for the plaintiff.

The record shows there was substantial evidence to support the following statement of the case. *Corinthian Corp. v. White & Bollard, Inc.,* 74 Wn.2d 50, 51, 442 P.2d 950 (1968).

Plaintiff on April 10, 1967, executed, acknowledged and delivered to the defendant a quitclaim deed to virtually all of her property. The property consisted principally of a residence in which the plaintiff and defendant and the latter's four children had lived for many years. The children had been brought up principally under the care of the plaintiff. At the time of trial the children had grown and had left the home and the defendant was divorced for the second time and had returned from California to live in an apartment at the residence property. The residence property conveyed was income property and had a value of approximately $85,000. On January 12, 1968, on the petition of Rita McCutcheon, the defendant's daughter, and with plaintiff's consent, the petitioner had been appointed her guardian. The petition alleged and the court found "that said GRACE SANDELL is not incompetent but at times is unable to handle her own affairs due to her advanced age."

At the time of trial on April 5, 1968, however, plaintiff was incompetent and unable to testify.

There had long been a close and loving relationship between the plaintiff and her daughter as well as between the plaintiff and the four grandchildren. Plaintiff was thrifty, but believed that her daughter was not. There was an incident of a $4,000 mortgage loan obtained by the defendant pursuant to a general power of attorney dated May 11, 1963, delivered by the plaintiff to her daughter for a business venture of the daughter, as a result of which plaintiff had been compelled to pay off the loan from her savings.

It had long been plaintiff's desire to provide for her daughter and her grandchildren, all five of whom plaintiff came to refer to as her children. The intention was especially evident from her prior wills and a written memorandum dated October 19, 1966, directing a change in her 1962 will. Thus, her 1956 will left her property to her daughter for life with full power of disposition except that she was prohibited from giving the property away to persons other than her children, and a remainder interest to the children. Her 1962 will set up a testamentary trust in her property with provisions for the benefit of her daughter, but with a further provision that if her daughter moved from the residence the property was to be divided one-third to her daughter and one-sixth to each of the four grandchildren. The 1966 written memorandum provided that plaintiff's estate should be left to her daughter and grandchildren in equal shares, save that the daughter's share was charged with the $4,000 previously paid by the plaintiff on her mortgage loan. The April 10, 1967, will, executed on the same date as the deed here involved, devised plaintiff's property to her daughter, if living; otherwise to plaintiff's grandchildren and their respective issue by right of representation.

· There was medical evidence based on the plaintiff's doctor's observations over a period of several months ending in December, 1967, while the plaintiff was hospitalized with a broken hip, that the plaintiff was a "typical senile cerebral

arteriosclerotic,"; that her condition was a result of a progressive organic disease which had become progressively worse and that in her doctor's opinion "this has been going on at least for six months to a year and maybe longer . . ." The doctor testified:

There may be times they are lucid when they first start. And then there are intervals they say things out of context and they are kind of goofy.

He also testified that persons with plaintiff's condition "are just senile and old" and have "lost their power to reason and judgment and recall recent events. They live in the past." Defendant testified that at the date of the deed on April 10, 1967, her mother couldn't take care of the house any more; that she was getting forgetful about paying bills and collecting rents and that at her age she was not capable of handling these matters. Defendant further testified:

Q  Had you ever had any discussion prior to that time in relation to the matter of transfer of her property to you?
A  Yes, we had talked about this for a number of years. She wanted me always to have the property and at my death it would go to the children, and as the years grew on we talked about it several times, and she wanted to escape probate charges, so finally we just talked about it, decided to go down. She said for me to select a lawyer and she would be glad to have the property deeded over to me with—there was to be no change, she would be there and I would be there and that it would go to the children. That was our idea.
Q  This was to be an absolute deed, not a trust?
A  No, it was a deed.

. . .

Q  was your intention at  . . .  the time of the deed, April 10,  . . .  '67, that your mother's position in the house would still remain the same? Is that correct?
A  Yes, just the same.
Q  And her rights in the house would remain just the same?
A  Yes, absolutely.

Q And the purpose of the deed as far as you are concerned . . . was to protect your mother's interest?
A Yes, that's true.
Q And you really didn't take the land for yourself?
A That's correct.

Defendant's attorney, selected by her to draft the instruments, testified:

She called me on the telephone and she indicated to me that she and her mother would like to come into my office and have wills drawn up and her mother deed some property to her because her mother was getting old and was unable to take care of her own affairs . . .

Q Did Mrs. Brownfield before—what reason did she give for wanting you to draw up the deed?
A She indicated that her mother was getting old, she was in her 80's or something, and that she was afraid that people would come around and cheat her mother, that her mother had forgotten to pay bills in the past and the sewer district had put a lien on the house or something for not paying the sewer bill, and her mother was forgetful at times about paying bills. She put bills in the drawer and would just forget about paying them, and things of that nature.

Defendant's attorney was not originally known to the mother and he never spoke to nor conferred with the mother alone. On April 10, 1967, the daughter brought the mother into the attorney's office to execute a deed and a will for the mother and a will for the daughter already prepared. After an explanation by the attorney, the instruments were executed and the wills witnessed. The attorney testified

Well, it was my understanding that they both wanted a will, and Mrs. Sandell wanted Mrs. Brownfield to have a will leaving everything to the children to insure that the children would have everything after Mrs. Brownfield died.

The will that he prepared for the defendant provided for a life estate in the plaintiff and a remainder interest in the children. He informed the mother "that the deed and Wills would take care of her worry of insuring that the property

would go to the grandchildren." However, the documents executed did not protect against the possibility of sale, mortgage or other disposition of the property by the defendant during her lifetime or against the possibility that she might revoke her will. The omission to provide this protection was apparently inadvertent but there is no affirmative evidence that plaintiff was informed of the inadequate protection afforded by the documents executed. The evidence is undisputed that prior to the execution of the documents involved, plaintiff did not receive independent legal or tax advice or independent business advice from anyone concerning the nature of the documents or their limitations or their provident or improvident character or as to alternate plans by which to accomplish the protection of the plaintiff during her lifetime and the interests of the defendant and her four children upon the plaintiff's death.

The deed was left in the custody of the daughter's attorney until August, 1967, when the daughter withdrew the deed and had it filed of record. She then mortgaged the property for $7,000, using part of the proceeds for paying the cost of repairs and improvements on the residence property and part of it for personal use including the payment of a personal dental bill.

Sometime later the plaintiff began to express concern to several people including her former son-in-law and her granddaughter, Rita McCutcheon, concerning whatever it was that she had signed. She stated that she wasn't sure what she had signed. In her deposition testimony read into evidence below, she testified that she did not intend to deed the property to her daughter and was not aware that she had done so. There was also evidence from the plaintiff that although she loved her daughter, she was aware of her spendthrift ways and would not wish to dispose of her property in a fashion that would imperil the ability of her grandchildren to receive the property.

Plaintiff, through her present counsel, on September 6, 1967, caused suit to be brought to set aside the deed. The theory of plaintiff's case below and on appeal was that

when the deed was executed, Mrs. Sandell was in a weakened mental condition and that the deed was executed as a result of defendant's undue influence. The court found that the defendant

> is an intelligent and positive personality and in April, 1967 did not wish to wait for the probate of her mother's Wills. That at said time GRACE SANDELL was age 86 years and susceptible to pressures and fears of insecurity and safety; that at the time the guardian was appointed GRACE SANDELL was incompetent and suffering from severe symptoms of hardening of the arteries affecting her mental capacity and and [sic] been suffering said disease for a period of time.

The court further found that on April 10, 1967, defendant took Mrs. Sandell to the office of the attorney; that Grace Sandell did not know the attorney and had never talked to him previous to that time; "that said Attorney had GRACE SANDELL sign a Quit Claim Deed to RITA BROWNFIELD; that said deed covered all the property then owned by GRACE SANDELL plus other property previously owned." and that subsequently Grace Sandell was and is in a rest home under guardianship supported by social security and welfare. The court concluded "That the Defendant executed [sic] undue influence on GRACE SANDELL in obtaining the Quit Claim Deed to all of the property of GRACE SANDELL; . . ." The judgment entered on September 9, 1968, set aside the quitclaim deed and quieted title in the plaintiff.

Defendant first contends that the plaintiff's deposition taken in December, 1967, at the instance of defendant's attorney (not her attorney on appeal) was not admissible because plaintiff was mentally incompetent to testify. Defendant relies upon the medical testimony of Dr. Dale D. Popp, an orthopedic surgeon who examined Mrs. Sandell in Spokane while she was undergoing treatment for a hip fracture from September 15, 1967, to December 18, 1967, and upon the plaintiff's deposition testimony itself as showing confusion and lack of memory. RCW 5.60.050 provides that persons of "unsound mind" are not competent to testify. The statute, however, "refers to those who are without

comprehension at all, not to those whose comprehension is merely limited." *State v. Hardung,* 161 Wash. 379, 297 P. 167 (1931). If at the time of her deposition she understood the nature of an oath and was capable of giving a correct account of what she has seen and heard, her evidence was admissible. *State v. Moorison,* 43 Wn.2d 23, 259 P.2d 1105 (1953). The fact that at the time of trial on April 15, 1968, after preliminary examination concerning her competency, the court excluded plaintiff's oral testimony does not necessarily prove that at the date of the deposition she was not a competent witness. The disease from which she was suffering was a progressive one. She might have been competent to testify when her deposition was taken in December, 1967, without being competent to testify in April, 1968, following. It was for the trial court, either in passing on the preliminary question of admissibility or in passing upon the motion to strike the deposition after the deposition testimony was heard, to determine either from the nature of the answers given to the questions asked or from expert medical testimony concerning her competency at the time that the deposition was taken or from both, whether the witness was competent to testify. See *State v. Moorison, supra;* CR 26(d). The trial court exercised its discretion in holding the deposition testimony admissible. *Cf., Sumerlin v. Department of Labor & Indus.,* 8 Wn.2d 43, 111 P.2d 603 (1941), overruled on other points; *Windust v. Department of Labor & Indus.,* 52 Wn.2d 33, 323 P.2d 241 (1958). The court's action is not reviewable here in the absence of abuse of discretion. *State v. Wyse,* 71 Wn.2d 434, 429 P.2d 121 (1967). We find none here.

The evidence on the issue of Mrs. Sandell's competency on April 10, 1967, was in substantial conflict. The court made no express finding as to her competency on April 10, 1967; he limited his findings as to competency to the date that a guardian was appointed for her on January 12, 1968. The medical evidence, however, supported the court's finding that Grace Sandell at the time of the appointment of the guardian was "suffering from severe symptoms of hard-

ening of the arteries affecting her mental capacity and and [*sic*] been suffering said disease for a period of time."

    If the plaintiff was incompetent on April 10, 1967, the gift by deed of virtually her entire estate would have been void for plaintiff's want of capacity to make a gift. 38 Am. Jur. 2d *Gifts* § 12 (1968). See *Simpson v. Holbrook*, 21 Wash. 410, 58 P. 207 (1899). However, plaintiff guardian's basic contention is that the defendant exercised undue influence upon her mother in obtaining the deed. The trial court agreed. The conclusions expressly state the defendant was guilty of "undue influence." This conclusion is capable of being construed and considered as a factual finding. See *Ferree v. Doric Co.*, 62 Wn.2d 561, 383 P.2d 900 (1963); *Gray v. Fuller*, 85 Wash. 13, 147 P. 402 (1915). Furthermore, if there is no express finding upon a material fact, the fact is deemed to have been found against the party having the burden of proof. *Ingle v. Ingle*, 183 Wash. 234, 48 P.2d 576 (1935). As later pointed out, the burden of proving the absence of undue influence when a confidential relationship exists between the parties is upon the defendant. The existence of undue influence is a factual question. 38 Am. Jur. 2d *Gifts* § 108 (1968); *cf., Gray v. Fuller, supra* (fraud); *In re Estate of McDonald*, 60 Wn.2d 452, 374 P.2d 365 (1962) (gift causa mortis). If a confidential relationship exists between mother and daughter, then evidence to sustain the gift between such persons

> must show that the gift was made freely, voluntarily, and with a full understanding of the facts . . . If the judicial mind is left in doubt or uncertainty as to exactly what the status of the transaction was, the donee must be deemed to have failed in the discharge of his burden and the claim of gift must be rejected.

38 Am. Jur. 2d *Gifts* § 106 (1968).

    A confidential or fiduciary relationship between two persons may exist either because of the nature of the relationship between the parties historically considered fiduciary in character; *e.g.*, trustee and beneficiary, principal and agent, partner and partner, husband and wife, physi-

cian and patient, attorney and client; or the confidential relationship between persons involved may exist in fact. As stated in Restatement of Restitution § 166 d. (1937):

A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation is particularly likely to exist where there is a family relationship . . .

*Ambrosius v. Katz,* 2 Ill. 2d 173, 117 N.E.2d 69 (1954); *Vesy v. Giles,* 108 N.E.2d 300 (Ohio Com. Pl. 1952); See *Salter v. Heiser,* 36 Wn.2d 536, 550, 219 P.2d 574 (1950); *cf., Collins v. Nelson,* 193 Wash. 334, 345, 75 P.2d 570 (1938); 25 Am. Jur. 2d *Duress and Undue Influence* §§ 38, 36, 37 (1966).

Parentage alone does not necessarily create a confidential relationship between parent and child. There must be something more. *Zarnowski v. Fidula,* 376 Pa. 602, 103 A.2d 905 (1954). However, the fact of parentage frequently furnishes the occasion for the existence of a confidential relationship. This is true when the parent may become dependent upon the child, either for support and maintenance, or for care or protection in business matters as well, or for both, and the child, by virtue of factors of personality and superior knowledge and the assumption of the role of adviser accepted by the parent, may acquire a status, *vis-a-vis* the parent, that will bring about the confidential relationship. 39 Am. Jur. *Parent and Child* §§ 95, 98, 99 (1942). Because undue influence is treated in law as a species of fraud (37 Am. Jur. 2d *Fraud and Deceit* § 6 (1968); 25 Am. Jur. 2d *Duress and Undue Influence* §§ 35, 36 (1966) evidence of a gift between persons in a confidential relationship must be clear, cogent and convincing. 38 Am. Jur. 2d *Gifts* § 106 (1968); See *Meyer v. Campion,* 120 Wash. 457, 207 P. 670 (1922); *cf., In re Estate of Hamilton,* 26 Wn.2d 363, 174 P.2d 301 (1946) and *Whalen v. Lanier,* 29 Wn.2d 299, 186 P.2d 919 (1947). The existence of undue influence between persons in a confidential relationship is more readily inferred.

In the instant case the trial court's determination that

undue influence exists here is supported by the facts and cases, including (1) plaintiff's age and weakened or impaired mental condition;[1] (2) that the deed was contrary to Mrs. Sandell's prior intention that her grandchildren be protected expressed in a writing as late as October 19, 1966;[2] (3) that plaintiff had a concern to protect the defendant against her own improvidence, a concern that could be defeated by an outright deed; (4) that the documents were prepared by defendant's personal attorney without prior and separate consultation with the plaintiff.[3] The fact that the attorney was an independent contractor does not absolve the defendant from her duty to protect the plaintiff and to disclose to her fully the significance of the documents signed.[4] (5) that the preparation of both a deed and wills was without disclosure of their inadequate protection of the interest of the plaintiff in a life estate and the grandchildren's ultimate inheritance.[5] It would be strange indeed if the requirements of fairness and good faith which create a duty of disclosure on occasion even as between vendor and vendee or lessor and lessee and in certain instances when the parties involved deal with one another at arm's length[6] were relaxed in the case of a person in a confidential relationship with respect to a transaction in which the grantee has furnished no consideration; (6) that the transfer by plaintiff of substantially her entire estate by

[1] *Hattie v. Potter*, 54 Wash. 170, 102 P. 1023 (1909); *Tecklenburg v. Washington Gas & Elec. Co.*, 40 Wn.2d 141, 241 P.2d 1172 (1952).

[2] *In re Estate of Tresidder*, 70 Wash. 15, 125 P. 1034 (1912). See *In re Estate of Smith*, 68 Wn.2d 145, 411 P.2d 879, 416 P.2d 124 (1966).

[3] See *Meyer v. Campion*, 120 Wash. 457, 207 P. 670 (1922).

[4] See analogous negligence rule concerning nondelegable duties. W. Prosser, Torts § 70, at 483 (3d ed. 1964); 41 Am. Jur. 2d *Independent Contractors* § 36 (1968); *Wodnik v. Luna Park Amusement Co.*, 69 Wash. 638, 125 P. 941 (1912).

[5] See *In re Estate of Hanson*, 169 Wash. 637, 14 P.2d 702 (1932).

[6] *Obde v. Schlemeyer*, 56 Wn.2d 449, 353 P.2d 672 (1960), noted in 36 Wash. L. Rev. 202 (1961); *Ikeda v. Curtis*, 43 Wn.2d 449, 261 P.2d 684 (1953); *Oates v. Taylor*, 31 Wn.2d 898, 199 P.2d 924 (1948); *Perkins v. Marsh*, 179 Wash. 362, 37 P.2d 689 (1934).

way of gift left her dependent for support and maintenance upon her daughter and others;[7] (7) that there was an entire absence of independent advice to the plaintiff prior to the gift by deed. The absence of independent advice is not ipso facto fatal to the validity of the gift but an inference may be drawn that undue influence was exerted.[8]

■ In our opinion, the court had the right to find from the facts reviewed, including the existence of a confidential relationship, that the deed was obtained by the exercise of undue influence.[9] We cannot substitute our findings for those of the trial court. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

The judgment is affirmed.

UTTER and WILLIAMS, JJ., concur.

Petition for rehearing denied May 20, 1970.

---

[7]*Kennedy v. Currie*, 3 Wash. 442, 28 P. 1028 (1892); *Hattie v. Potter*, 54 Wash. 170, 102 P. 1023 (1909) cf., Comment, 58 Mich. L. Rev. 90, 91 (1959).

[8]*Meyer v. Campion*, 120 Wash. 457, 207 P. 670 (1922); *Zvolis v. Condos*, 56 Wn.2d 275, 352 P.2d 809 (1960); cf., *In re Estate of Smith*, 68 Wn.2d 145, 411 P.2d 879, 416 P.2d 124 (1966).

[9]See summary in 25 Am. Jur. 2d *Duress and Undue Influence* § 36 (1966).