[No. 5886–3–II.   Division Two.   December 10, 1982.]

ANASTASIA WHITE, *Appellant,* v. LEO C. WHITE, *Respondent.*

*Thomas Morrow* and *Sandra Cribbs,* for appellant.

*Donald Cramer,* for respondent.

PETRIE, J.—Plaintiff, Anastasia "Daisy" White, appeals from a decree quieting title to the family home in defendant, her son Leo White. Because the trial court imposed upon plaintiff a burden which the law does not, we reverse and remand for a new trial.

This action arises out of a serious dispute between two

members of a closely knit family who had worked and even lived together for more than 35 years. Plaintiff, Daisy White, is the 94–year–old mother of defendant, Leo White, who is 72 years old and Daisy's eldest child. The White family, in addition to Leo and Daisy, consists of Daisy's other two children, Beatrice and Howard. Since 1947, they have owned and operated a family laundry and dry cleaning business in the Port Angeles area. This family business began during World War II when Daisy acquired the Olympic Laundry & Cleaners. Soon thereafter she bought out her primary competitor, the Cooperative Laundry. Although at first the businesses were solely Daisy's, she, through the years, has gradually and periodically divested herself of her ownership interest by sale or gifts to her three children. All four members of the White family worked in the laundries; however, Leo, shortly after discharge from military service in 1946, assumed the position of management and control.

Contemporaneous with the development of the family business was the creation and maintenance of a family home. This large house was purchased in 1947 and served as a residence for Daisy, Leo and his family, Beatrice and her family, and Howard. The funds used to maintain the family home came from the "White account" to which all four White family members contributed a share. Leo managed this account and also was given authority to draw checks upon Daisy's personal checking account. Leo was the only child to reside in the home continuously and, at the time of the trial below, he and his wife lived there with Daisy.

Although all the members of the White family participated, to some degree, in the important decisions to be made, it is clear that Leo was the primary manager and steward of his family's intertwined business and financial affairs. Leo was considered to be the trusted family figurehead, loved and depended upon by his mother.

In July 1971, Daisy signed a quitclaim deed conveying the family home to Leo, reserving to herself a life estate

therein. The deed recites that it was executed in consideration of "love and affection." It was recorded at Leo's request in August of 1971. Simultaneously upon execution of this deed she also signed a "Bill of Sale" which transferred all her interest in the Cooperative Laundry to Leo. No consideration for the sale is expressed on the face of the document. The dates of the Bill of Sale and the quitclaim deed are the same; the person requesting the filing and recordation, Leo, is the same; the notary, Lucille Glenn, is the same.

In the spring of 1979 Daisy contacted an attorney for the purpose of changing her will which had been drafted in 1976 by another attorney. In attempting to execute her wish that her home be shared by all her children, the attorney discovered that the home she now wished to dispose of by will had already been conveyed. Daisy claims she was unaware of this conveyance; thus, she brought this action to cancel the deed and quiet title in herself, alleging that transfer of title was the result of fraud, overreaching and undue influence by Leo. She claims that this transfer was never discussed between the parties and that Leo obtained her signature on the document through abuse of his trusted position. She argues that it must have been one of many documents Leo presented for her signature while she was seated at her sewing machine at the laundry and which, in her customary manner, she unquestioningly and unwittingly signed. Daisy claims that the document was notarized outside her presence and that she never received any legal advice before signing the deed. Leo claims the transaction was discussed between them and, in his answer, alleged that title was transferred to him in an effort to minimize federal and state taxes upon Daisy's death. He claims this gift was made freely, voluntarily, with full understanding and with the assistance of counsel.

At trial, the only testimony given by persons who were directly involved in the conveyance, other than the parties hereto, came from an attorney, Howard Doherty, who had prepared the quitclaim deed and from his secretary, notary

Lucille Glenn. Mr. Doherty's testimony reflects an understandable lack of memory. At best, he recalled dealing primarily with Leo in this transaction and did not recall discussing the transfer with Daisy. Mr. Doherty also testified that in 1976, when Daisy came to him to change her 1964 will, she requested that the house go to Leo upon her death. He, as he testified, in an attempt at humoring this elderly woman with an apparent lack of memory, did not wish to confront her directly and failed to inform Daisy that she no longer had a house to dispose of by will. According to Mr. Doherty's memory at the time of trial, because the conveyance of the house by quitclaim deed in 1971 and its disposition under the will in 1976 were identical, no purpose would have been served in a needless confrontation over this fact. No attempt was made at trial to introduce the 1976 will in evidence.

Mrs. Glenn, on the other hand, had considerably better recall. She testified that in 1971 Daisy had visited the office twice to read over the documents before signing and that, although Mr. Doherty was not present either time, she had no doubt that Daisy, a vigorous and competent 81-year-old woman at the time, understood the nature of the transaction. Mrs. Glenn testified that she had never notarized a document outside the presence of the person whose signature was required.

The trial court, in resolving this factual dispute, recognized the necessity to reach a decision based upon building blocks of circumstantial evidence, inferences and credibility,[1] and concluded that Daisy had "failed to carry her burden of proof that Leo White exerted undue influence" over her. In a post-trial motion, seeking (1) an amendment to the complaint by challenging also the Bill of Sale of the Cooperative Laundry and (2) a new trial based upon newly

---

[1]No aspersion is meant to be cast upon a decision so formed. Indeed, resolution of many disputes requires the formidable effort of piecing or weaving together parts in order to arrive at the whole. This factfinding process can sometimes become a Herculean task for the conscientious and is always one which is exercised only at the trial court level.

discovered evidence, plaintiff submitted her 1976 will and an affidavit from attorney Doherty. The express words of the 1976 will only gave Leo "the use, rents, and profits [of the home property] during his lifetime" and, thereafter, in fee to Howard and Beatrice. In his post–trial affidavit, Doherty retracted much of his trial testimony which had tended to show Daisy's gift of the house to Leo was not contrary to her intentions as expressed in her written wills. (The 1964 will and a note written by Lucille Glenn in June of 1971, also produced in the post–trial motion, revealed evidence which might have supported Daisy's position at trial.) This request for a new trial and an amendment of the pleadings was denied.

Because of our disposition, it is unnecessary to consider plaintiff's challenge to many of the factual findings or plaintiff's claim of error in the trial court's refusal to grant a new trial or to allow amendment of the pleadings. The sole issue for our review is whether the trial court erred in placing upon the donor of a "gift" inter vivos, under the circumstances presented, the burden of proving undue influence.

■ Though there is considerable case law to the contrary in other jurisdictions, Washington has steadfastly adhered to the rule, first enunciated 60 years ago, that where the donee occupied a fiduciary relationship to the donor at the time the gift was made, the donee bears the burden to prove lack of undue influence. *Meyer v. Campion,* 120 Wash. 457, 207 P. 670 (1922). That rule was last reiterated in this jurisdiction in *McCutcheon v. Brownfield,* 2 Wn. App. 348, 467 P.2d 868 (1970), *review denied,* 78 Wn.2d 993 (1970). *See* 38 Am. Jur. 2d *Gifts* § 106 (1968), where the rule is stated:

> In such a situation the donee must show by explicit and convincing evidence that the donor intended to make a present gift and unmistakably intended to relinquish permanently the ownership of the subject of the gift.

Although the trial court's express findings of fact are silent as to the existence of a fiduciary relationship between

Daisy and Leo, the trial court's memorandum opinion unmistakably supplies this essentially uncontested fact. The trial court announced:

[I]t's important to determine the relationship, the legal relationship of Leo White and Daisy White. They are not only mother and son, but it's clear that they are of a close and long standing business relationship, and it's clear that Mr. White has substantially managed not only the family assets, but also Mrs. White's business affairs for a long period of time, and I think for all intents and purposes and from a legal standpoint this has ripened into what is called in the law a fiduciary relationship, where Mr. White owes his mother the utmost good faith.

In view of this fact, the trial court erred in placing the burden of proof of undue influence upon the donor, Daisy. The proper approach requires Leo, in this case, to prove the antithesis of undue influence because of the parties' fiduciary relationship. After Daisy proved the fiduciary relationship, it became Leo's burden to prove lack of undue influence.

Defendant argues, however, that the burden of proof (persuasion) in cases of alleged undue influence in the execution of inter vivos gifts involving a fiduciary relationship is the same as the test employed in cases of challenged testamentary disposition of property also involving a fiduciary relationship. In a will contest, the initial burden is placed upon the contestant to prove the existence of undue influence by clear and convincing evidence; if so proved, only then does the burden shift to the proponent of the will to come forward with sufficient evidence to rebut this presumption. *In re Estate of Reilly,* 78 Wn.2d 623, 663, 479 P.2d 1 (1970); *In re Estate of Smith,* 68 Wn.2d 145, 411 P.2d 879, 416 P.2d 124, 19 A.L.R.3d 559 (1966). A fair reading of these cases indicates that the existence of a fiduciary relationship alone, *absent any other factors which might create suspicion,* is not sufficient to impose upon the fiduciary proponent the burden of proving the absence of undue influence.

As support for his argument, *i.e.,* that this same rule

applies to inter vivos transactions, Leo cites a federal court decision applying Washington law, *Hilton v. Mumaw,* 522 F.2d 588, 599 n.10 (9th Cir. 1975). In *Hilton,* the court was asked to determine the question of alleged undue influence in the execution of a contract for the sale of corporate stock. The court failed to distinguish the *McCutcheon* rule (involving an inter vivos gift) from the *Reilly* rule (involving a will contest). The court, in expressing a burden of proof rule applicable to a challenge to the validity of the execution of an express sales contract, stated that the *McCutcheon* rule, *i.e.,* imposing the burden to prove the absence of undue influence upon the finding of a fiduciary relationship alone, was mere dicta and, in any event, was modified by the later decision of *In re Estate of Reilly, supra.*[2]

While we do not question the federal court's application of the proper rule of law to the facts before it, we cannot accept that court's interpretation of Washington law applicable to an inter vivos gift. The rule in *Reilly* is limited to will contests.

The rationale for distinguishing a challenge to a gift during one's lifetime from a challenge to a disposition upon one's death has been enunciated in this jurisdiction. By making a gift during a person's lifetime, he (she)

---

[2]The language containing this analysis is found in a footnote and reads verbatim as follows:

"Hiltons cite *McCutcheon v. Brownfield,* 2 Wash.App. 348, 356–57, 467 P.2d 868, 873–74 (1st Div.), *review denied,* 78 Wash.2d 993 (1970), for the proposition that the existence of a fiduciary obligation shifts the burden onto defendants of proving an absence of undue influence. The statements in the opinion to this effect, however, are dicta, since the burden of proof in that case may have shifted only because of additional evidence in the record of undue influence, in particular, the grantor's impaired mental condition. *Id.* at 357–59, 467 P.2d at 874. But in any case, the later decision of the Washington Supreme Court in *In re Estate of Reilly,* 78 Wash.2d 623, 647, 663–64, 479 P.2d 1, 8, 15, 24–25 (1970), has severely limited the availability of the presumption of undue influence. Hiltons have presented no evidence here that surpasses the evidence held insufficient in *Reilly* to shift the burden of proof. *Id.* at 657–64, 479 P.2d at 21–25; *see id.* at 694–95, 479 P.2d at 42–43 (Finley, J., dissenting)." *Hilton v. Mumaw,* 522 F.2d 588, 599 n.10 (9th Cir. 1975).

strips himself of that which he can still enjoy and of which he may have need during his life; while by his will he disposes of that which can be of no further use to him. As he is, under ordinary conditions, so much the less likely to do the first than the second, courts subject gifts to the sharper scrutiny.'"

*Whalen v. Lanier,* 29 Wn.2d 299, 312, 186 P.2d 919 (1947). Stated another way, a testamentary disposition is revocable during the life of the testator and, at least in the absence of a valid contract not to do so, is solely within one's unfettered discretion.

In conclusion, we hold that in alleged inter vivos gift transactions, upon a sufficient showing that the donor has reposed such trust and confidence in the donee as to create a fiduciary relationship, a presumption arises which thrusts upon the donee the burden of persuasion to establish the absence of undue influence. *Accord, Luse v. Grenko,* 251 Iowa 211, 100 N.W.2d 170 (1959); *Schlichting v. Schlichting,* 15 Wis. 2d 147, 112 N.W.2d 149 (1961). *See generally* 3 W. Bowe & D. Parker, *Page on Wills* § 29.84 (1961).

Accordingly, we reverse and remand for a new trial. Because of our disposition, plaintiff's request for an amendment to the pleadings to include a challenge to the Bill of Sale of the Cooperative Laundry is a matter to be addressed to the discretion of the trial court upon remand.

REED, C.J., and PETRICH, J., concur.