IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Estate of William Ross Taylor, | No. 68222-9-I |
| Deceased. | (consolidated with 68224-5) |
| PATRICIA CAIARELLI, | DIVISION ONE |
| Respondent/ Cross-Appellant, | |
| v. | UNPUBLISHED OPINION |
| CHARLES E. TAYLOR II, | FILED: May 19, 2014 |
| Appellant, | |
| REUBEN TAYLOR, JR., and EMILY TAYLOR, and the marital community thereof, | |
| Cross-Respondents, | |
| and | |
| ELIZABETH M. TAYLOR, | |
| Respondent. | |

BECKER, J. — William Ross Taylor died in a boating accident in 2005. This appeal arises from a jury trial of a dispute among his survivors over ownership of nonprobate assets. The participants in the dispute include Patricia Caiarelli,

William's ex-wife and the mother of his young son, A.C.T.; William's brother, Charles Taylor; and William's parents, Reuben and Emily Taylor. A jury decided that William designated Charles to hold assets in trust for A.C.T., not to keep them for himself. We affirm the judgment on the verdict against Charles. We reverse the trial court's orders dismissing Reuben and Emily. The matter is remanded to permit Caiarelli, who is acting as her son's guardian, to pursue her claim that Reuben and Emily exerted undue influence over William.

## FACTS

This is the second time this matter has been before this court. Our previous opinion sets forth the genesis of the dispute—a young man devastated by the loss of his job at Microsoft and the breakdown of his marriage, the bitterness of the dissolution proceedings, his love and concern for his young son, a will that directed all of his assets into a trust for his son, his untimely death, the mishandling of his estate by his brother leading to the appointment of a new estate administrator, and procedural irregularities requiring reversal of summary judgment orders that prematurely resolved the ownership issues. Estate of Taylor, noted at 159 Wn. App. 1003 (2010). As a result of the first appeal, the parties returned to the trial court to litigate competing claims to the proceeds of a Fidelity retirement account, three AIG life insurance policies and five Northwestern Mutual life insurance policies.

The record shows that in 2003, William lost his job and Caiarelli began divorce proceedings. William prepared a will directing that in the event of his death, all of his assets were to be held in trust for his son. His brother Charles

was named as the trustee. His father Reuben was named as the alternate trustee, and his mother Emily was named as a second alternate.

The final decree dissolving William's marriage to Caiarelli was entered in February 2005. William started working for a new company in July 2005. Also in July 2005, William took the actions that are central to this dispute. He signed a change of owner designation transferring ownership of the Northwestern Mutual policies from himself to his father, Reuben. He rolled over the Fidelity retirement account and named Charles as the primary beneficiary and Reuben as contingent beneficiary. And he took out three AIG life insurance policies that were available as a benefit of his new employment, again designating Charles as primary beneficiary and Reuben as contingent beneficiary.

Two months later, William drowned.

During Charles' tenure as personal representative of William's estate, Charles obtained for himself the proceeds of the AIG policies and the Fidelity account. Reuben received the proceeds of the Northwestern Mutual policies. Neither Charles nor Reuben took steps to fulfill trustee responsibility for the testamentary trust William had created for his son.

Caiarelli brought suit against Charles to have a constructive trust imposed upon these proceeds for the benefit of A.C.T. She claimed that despite the appearance that the financial actions William took in July 2005 were for the benefit of Charles and Reuben personally, William's actual intent as shown by his will was for Charles and Reuben to hold the proceeds as trustees for A.C.T. Our previous opinion reversed orders of summary judgment and remanded to permit

Caiarelli to litigate the intent theory. When the case returned to the trial court after the mandate issued on May 13, 2011, Caiarelli pursued an additional theory of undue influence by Charles, Reuben, and Emily.

The case was tried to a jury from November 10 to November 30, 2011. Emily was dismissed early in the trial. At the end of the plaintiff's case, the court granted a motion to dismiss Reuben under CR 50(a). The defense rested without making an opening statement or calling any witnesses. The jury rendered a special verdict against Charles, finding that (1) William intended to designate Charles as the beneficiary of the AIG policies and the Fidelity account as trustee for A.C.T., not for his personal benefit, and alternatively (2) Charles unduly influenced William to designate him as the beneficiary of the AIG policies and the Fidelity account.

Charles moved for judgment notwithstanding the verdict. The trial court denied the motion and entered judgment against Charles for the value of the three AIG policies and the Fidelity account that should have been preserved for A.C.T., the sum of $824,212.85, plus prejudgment interest, for a total judgment of $1,422,077.54.

Charles appeals from the order denying his motion for judgment notwithstanding the verdict. Caiarelli cross appeals from the orders dismissing Emily and Reuben.

CHARLES' APPEAL

This court reviews the denial of a motion for judgment notwithstanding the verdict de novo, applying the same standard of review as the trial court. Hizey v.

4

Carpenter, 119 Wn.2d 251, 271, 830 P.2d 646 (1992). "'A directed verdict or judgment n.o.v. is appropriate if, when viewing the material evidence most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party.'" Hizey, 119 Wn.2d at 271-72. The moving party must prove that there is no substantial evidence, or reasonable inference from that evidence, which, viewed in a light most favorable to the prevailing party, supports the decision made by the jury. Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816 (1997).

Charles argues on appeal that no evidence was presented that William intended anything other than what was on the documents themselves when he typed in Charles' name as beneficiary on the AIG policies and the Fidelity account. He is mistaken. As we said in our previous opinion that reversed summary judgment for Charles on this issue, "a jury could conclude that William intended to leave these assets to his son by entrusting them to his father and brother in a representative capacity." Taylor, noted at 159 Wn. App. 1003, 2010 WL 5464751, at *6. And now a jury has concluded exactly that. The jury decision is supported by the following evidence:

- William's four wills executed from 2003 to 2004 leaving substantially all of his assets to his son and nothing to his father or his brother.

- William's increasing concern after the divorce that Caiarelli would have access to his assets in the event of his death.

- William's attorney Craig Coombs' testimony that, during the preparation of two wills in 2003 and 2004 before the dissolution of his marriage, William's intent was to leave all his assets to A.C.T., as demonstrated by language expressly directing that that his estate hire

5

> an attorney to represent A.C.T. and to make sure all of William's property was placed in a trust on behalf of A.C.T.

- Testimony of three people that the beneficiary forms were not worded in such a way as to give William the option of indicating that Charles and Reuben were named in their capacity as trustees for A.C.T.

- William's decision to name Charles as trustee of the trust to benefit A.C.T. that was created in his will.

The trial court did not err in denying Charles' motion for judgment notwithstanding the verdict on the intent claim.

The claim of undue influence by Charles was an alternative theory leading to the same result as the intent theory. Charles assigns error to instruction 13, which set forth the burden of proof on the claim of undue influence.

Instruction 13 equated the burden of proof for the beneficiary designations on the Fidelity account and the AIG insurance policies with the burden of proof for inter vivos gifts. This burden makes it easier for the challenger of the designation to prove undue influence than the burden of proof for testamentary designations. Which burden applies to beneficiary designations is an issue that has not been decided in Washington, and it will remain undecided in this opinion. The special verdict shows that the jury was unanimous as to the intent theory and almost unanimous (11-1) as to the undue influence theory. Because there was sufficient evidence to support the intent theory, we need not separately analyze whether there was sufficient evidence to support the verdict on the claim of undue influence by Charles. See Davis v. Microsoft Corp., 149 Wn.2d 521, 539-40, 70 P.3d 126 (2003). As a result, we need not decide Charles' claim of instructional error pertaining to undue influence.

Caiarelli's claim was brought under the Trust and Estate Dispute Resolution Act, chapter 11.96 RCW (TEDRA). The act provides a trial court with discretion to order reasonable attorney fees. RCW 11.96A.150. The trial court exercised its discretion to make a significant award to Caiarelli for attorney fees, costs, and other expenses. Charles asks for reversal of the fee award in the event the judgment against him is reversed. Because we are affirming the judgment against Charles, we decline to disturb the award of attorney fees, costs, and expenses against him. Charles requests attorney fees on appeal. That request is denied.

Caiarelli requests an award of attorney fees on appeal against Charles. That request is granted with respect to Charles' appeal, subject to compliance with RAP 18.1.

## CAIARELLI'S CROSS APPEAL

Caiarelli's cross appeal concerns the five Northwestern Mutual life insurance policies that William assigned to Reuben shortly before his death. Before the first appeal, the trial court awarded these policies to Reuben on summary judgment. We reversed, noting that Reuben's motion for summary judgment had been granted even though Reuben was not yet a party to the action, Caiarelli had not yet laid claim to the policies, and there had as yet been no discovery directed toward the question of whether they were estate assets. Taylor, 2010 WL 5464751, at *6-7.

On remand, the necessary procedural steps were taken so that Caiarelli could pursue A.C.T.'s claim to the proceeds of the five Northwestern Mutual

policies. Caiarelli's theory was that the transfer of ownership of the policies to Reuben was the result of undue influence exerted by William's parents working in concert. The ownership of these policies, which had a combined death benefit of $204,000, was not addressed in the final judgment as the result of Reuben's dismissal. The proceeds remained in the hands of Reuben as his personal property. Caiarelli cross appeals from the decisions to dismiss Reuben and Emily.

## PROCEDURAL ISSUES

We must first decide whether the cross appeal is properly before us. Reuben and Emily, represented by the same attorney as Charles, moved to dismiss the cross appeal after Caiarelli filed her brief of respondent/cross appellant.

The Taylors first contend Caiarelli's cross appeal was untimely because it was filed more than 30 days after they were dismissed.

The court dismissed Emily on November 17, 2011, on a motion for partial summary judgment decided at the beginning of the trial. The court dismissed Reuben on November 28, 2011, on a motion under CR 50(a) at the end of Caiarelli's case. The court entered the final judgment against Charles, the only remaining respondent, on December 20, 2011.

Generally, a notice of appeal must be filed within 30 days of the entry of the order appealed. RAP 5.2(a). Reuben and Emily contend Caiarelli's appeal is too late because Caiarelli filed her notice of cross appeal more than 30 days after the entry of the trial court's orders dismissing them. We disagree. Caiarelli is

8

entitled to review under RAP 2.4(b). Under that rule, the appellate court may consider an order or ruling not designated in the notice of appeal if: "(1) the order or ruling prejudicially affects the decision designated in the notice, and (2) the order is entered, or the ruling is made, before the appellate court accepts review." See Fox v. Sunmaster Prods., Inc., 115 Wn.2d 498, 798 P.2d 808 (1990). We see no reason to depart from this rule. To dismiss the cross appeal would make the pertinent rules exactly the same kind of "'trap for the unwary,'" Fox, 115 Wn.2d at 505, quoting Adkins v. Aluminum Co. of Am., 110 Wn.2d 128, 134, 750 P.2d 1257, 756 P.2d 142 (1988), that the rule was designed to avoid, and it would also encourage piecemeal appeals. We conclude the cross appeal is timely.

The Taylors next contend the appeal must be dismissed because they were not notified that their interests could be affected by Caiarelli's appeal from the final judgment. They rely on language from In re Saltis, 25 Wn. App. 214, 219, 607 P.2d 316, aff'd, 94 Wn.2d 889, 621 P.2d 716 (1980). In Saltis, the sole issue on appeal was "whether service by mail on the Department of Labor and Industries building containing the Director's office is sufficient to satisfy RCW 51.52.110." Saltis, 25 Wn. App. at 216. In finding service by mail sufficient, the court noted that the "general purpose of a notice of appeal is to inform the party in whose favor a judgment or decree has been rendered that the unsuccessful party desires a review of the case by a higher tribunal." Saltis, 25 Wn. App. at 219.

While the final judgment does not mention Reuben or Emily, Caiarelli's notice of cross appeal from that judgment adequately informed them that their dismissals were subject to further review. The notice was received by the attorney who represents them. An appeal from a final judgment brings up for review earlier orders, in this case including the orders of dismissal and related evidentiary rulings. Fox, 115 Wn.2d at 505. Reuben and Emily were not entitled to any particular notice other than the notice of cross appeal from the final judgment.

We deny the motion to dismiss Caiarelli's cross appeal. Caiarelli argues that the motion to dismiss is frivolous and that sanctions are warranted. We deny the request for sanctions.

## DISMISSAL OF REUBEN

We now consider the cross appeal on the merits. We first address the trial court's decision to dismiss Reuben. At the end of Caiarelli's case, the court granted Reuben's motion for judgment as a matter of law that the evidence was insufficient to support the claim of undue influence.[1] Later, during the instructions conference, the court also dismissed the intent claim against Reuben, resulting in his dismissal as a party. On appeal, Caiarelli argues that the trial court should have allowed the undue influence claim against Reuben to go forward with respect to the Northwestern Mutual policies.

This court reviews the decision to grant a motion for judgment as a matter of law de novo, applying the same standard as the trial court. Davis, 149 Wn.2d

---

[1] Clerk's Papers at 758-66.

at 530-31. Judgment as a matter of law is appropriate where viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. Davis, 149 Wn.2d at 531. Substantial evidence is that which would be sufficient to persuade a fair-minded, rational person of the truth of a declared premise. Davis, 149 Wn.2d at 531.

Undue influence is that influence which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice. In re Estate of Lint, 135 Wn.2d 518, 535, 957 P.2d 755 (1998).

When a challenged gift is testamentary in nature, the challenger bears the burden of proving the existence of undue influence. In re Estate of Melter, 167 Wn. App. 285, 299, 273 P.3d 991 (2012); White v. White, 33 Wn. App. 364, 370-71, 655 P.2d 1173 (1982). But when the challenged gift is inter vivos—a present gift made during the donor's lifetime—and the person attacking the gift establishes that a confidential relationship existed between the donor and the donee, the burden shifts from the challenger to the donee to show the absence of undue influence. Melter, 167 Wn. App. at 296. The rationale for the difference in burdens is the increased skepticism with which society views inter vivos gifts as opposed to testamentary transfers. A testamentary transfer is revocable; that is, a will can be changed. But a gift is irrevocable. A donor who makes a gift while alive "'strips himself of that which he can still enjoy and of which he may have need during his life; while by his will he disposes of that which can be of no

11

further use to him. As he is, under ordinary conditions, so much the less likely to do the first than the second, courts subject gifts to the sharper scrutiny.'" Whalen v. Lanier, 29 Wn.2d 299, 312, 186 P.2d 919 (1947) (internal quotation marks omitted), quoting Meyer v. Campion, 120 Wash. 457, 207 P. 670, 674 (1922).

The transfer of ownership of the five Northwestern Mutual policies is subject to sharp scrutiny because it was an inter vivos gift, not testamentary in nature. Reuben had originally purchased these policies for William. When William turned twenty-one, he became the owner of the policies. The dissolution decree distributed ownership of the policies to William. As the trial court fully understood, it was important for Caiarelli to prove the existence of a fiduciary or confidential relationship between Reuben and William because if she did so, the burden would be on Reuben to prove he did not exert undue influence on William.

When the case against Charles went to the jury, the trial court defined "fiduciary" and "confidential" in instruction 15, to which no error has been assigned. "A fiduciary relationship exists whenever one person occupies such a relation to the other party as to justify the latter in expecting that his interest will be cared for. A confidential relationship means (1) that a family member reposes some special confidence in another relation's advice and (2) that the relation purports to advise with his family member's interests in mind." Instruction 15 properly stated the law. See, e.g., McCutcheon v. Brownfield, 2 Wn. App. 348, 356-57, 467 P.2d 868, review denied, 78 Wn.2d 993 (1970). It is equally applicable to the case against Reuben.

12

The trial court ordered Caiarelli to make a proffer of whatever evidence she had to prove that Emily, Reuben, or Charles had any contact with William from the time of his divorce in February 2005 to the time the beneficiary designations were made in July 2005. The written proffer was to be served before opening statements on November 16, 2011, and if it was not, the court would consider striking the claim altogether.[2]

At the end of the trial, the court determined there was insufficient evidence that Reuben had given William any advice or had any contact that would prove the existence of a confidential relationship. The trial court stated there was "not a scintilla of evidence" that William had contact with Reuben around the time he transferred the ownership of the Northwestern Mutual policies to Reuben.[3]

Exclusion of the Ainsworth Testimony

In this context, Caiarelli raises a critical assignment of error to the exclusion of testimony by Caiarelli's sister Amy Ainsworth. The excluded testimony provided evidence that William's Chicago-based parents were in close and constant touch with him by telephone during the time in question.

In a pretrial disclosure of witnesses, Caiarelli stated that Ainsworth and her husband Brian would testify about their friendship with William, their knowledge of his mental health challenges, their knowledge of his love for his son, and their knowledge about William's relationship with Charles and Reuben.[4]

---

[2] Report of Proceedings (Nov. 15, 2011) at 17-20; Report of Proceedings (Nov. 17, 2011) at 85.

[3] Report of Proceedings (Nov. 23, 2011) at 102; Clerk's Papers at 46-48.

[4] Report of Proceedings (Nov. 17, 2011) at 72.

Ainsworth discussed how happy William was to have a family and how he was overjoyed when his son was born. She talked about the Caiarelli family parties that William attended and the significant and apparently meaningful relationships he had with members of Patricia's family. She testified that after the dissolution proceedings began, William became withdrawn in demeanor and refused all invitations.

After the jury was released on November 16, Ainsworth disclosed to counsel for Caiarelli for the first time a conversation she had with Emily, with Rueben also present. Rueben and Emily had come out from Chicago after William's death. The conversation occurred on the doorstep of William's house as the Taylors were cleaning it out; Ainsworth was there to pick up some personal items for A.C.T. Ainsworth said Emily became agitated and told them she had nightly, hour-long phone calls with William from the time of his dissolution in February 2005 until his death in September 2005.[5]

Caiarelli immediately notified opposing counsel of this development. The next morning, Caiarelli asked the court to admit the testimony. She suggested that opposing counsel be allowed to depose Ainsworth that evening and that Ainsworth be allowed to complete her testimony the following day.

The Taylors objected on the basis of unfair surprise. The court agreed that the issue was significant but nevertheless decided that the disclosure was untimely, given Caiarelli's failure to make a written proffer of the specific testimony about the doorstep conversation. The court framed the problem as

---

[5] Report of Proceedings (Nov. 17, 2011) at 13; Exhibit 67.

14

noncompliance with a discovery order and analyzed it in terms of Burnet v.

Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). The court

found that admitting the evidence would cause "great prejudice" to the

respondents.[6] The court determined that there had been a willful violation of the

court's order requiring disclosure of evidence of undue influence and no lesser

sanction than exclusion of the evidence would suffice:

> It's clear that the respondents did not have any notice of the testimony of Amy Ainsworth and that, in fact, if asked directly, the petitioner would have said that they didn't know of any such evidence. And I believe that petitioner's attorneys do have a duty to make an inquiry.
>
> So the first question I ask is, is there a lesser sanction that I could impose, lesser than some kind of striking of evidence, and could I ameliorate the prejudice in some way. And I think those questions are obviously combined.
>
> I could order a deposition, as suggested by Mr. Kimbrough. The trial is ongoing, questions have already been asked of witnesses. And even with a deposition, I think there is great prejudice to a party who has already stated, and I think it's fair to state, did not know the undue influence claim was even coming down the road.
>
> There is investigation that could have been done, the kind of which I have actually afforded in another context, another trial, the kind of remedy that might to recess the trial for a brief time. But that's an extraordinary remedy, simply not appropriate, and there is not enough time in this trial with a jury.
>
> So there are three sanctions that I could impose. I could strike the entire claim of undue influence. I could strike the two witnesses disclosed, Patrick Caiarelli and Amy Ainsworth, in their entirety. Or I could strike the testimony only of the event at issue. I think those are the only three sanctions left to me, since it's simply impossible at this time to start engaging in discovery in this six-year-old case.
>
> It's a difficult decision, as I said, because it's relevant evidence. But I'm persuaded that the least sanction I can impose is to strike the evidence of the conversation Ms. Ainsworth and Mr. Caiarelli say that they had with Emily Taylor after the death of William Ross Taylor that is in Exhibit 67.

---

[6] Report of Proceedings (Nov. 17, 2011) at 17.

> Finally, was this a willful violation? I think willful doesn't mean did the parties intentionally try to hide information. I think in this context it means did they violate a duty they had under the civil rules to investigate and disclose witnesses' testimony relevant to claims.
>
> I think that there is really no question here. It's admitted that they didn't even know or didn't ask the witness and couldn't have even answered an interrogatory directly had they -- had it been asked, because they simply didn't ask the witness that information and didn't fully disclose it for that reason. So I'm persuaded that there is a willful violation.[7]

Caiarelli argues that exclusion of Ainsworth's testimony about her doorstep conversation with Emily Taylor was error. We agree.

A trial court has broad discretion regarding the choice of sanctions for violation of a discovery order. However, to exclude testimony as a sanction is an abuse of discretion absent a showing of intentional nondisclosure, willful violation of a court order, or other unconscionable conduct. Burnet, 131 Wn.2d 484, 494, 933 P.3d 1036 (1997). When a trial court chooses one of the harsher remedies under CR 37(b), it must be apparent from the record that the court explicitly considered whether a lesser sanction would have sufficed and whether "the disobedient party's refusal to obey a discovery order was willful or deliberate and substantially prejudiced the opponent's ability to prepare for trial." Burnet, 131 Wn.2d at 494; Jones v City of Seattle, 179 Wn.2d 322, 338, 314 P.3d 380 (2013).

A willful nondisclosure is one "done without a reasonable excuse." Snedigar v. Hoddersen, 114 Wn.2d 153, 169, 786 P.2d 781 (1990). Cases finding no reasonable excuse deal with situations where the nondisclosure was knowing and intentional. See, e.g., State v. Hutchinson, 135 Wn.2d 863, 882-83,

---

[7] Report of Proceedings (Nov. 17, 2011) at 86-88.

959 P.2d 1061 (1998) (finding willfulness where defendant repeatedly and knowingly refused to undergo a court-ordered CR 56 evaluation), cert. denied, 525 U.S. 1157 (1999); Magana v. Hyundai Motor Am., 167 Wn.2d 570, 584, 220 P.3d 191 (2009) (responses which are knowingly false, misleading, and evasive are willful violations); Rivers v. Wash. State Conference of Mason Contractors, 145 Wn.2d 674, 686-87, 41 P.3d 1175 (2002) (responses which are knowingly incomplete are willful violations).

Ainsworth had been disclosed as a witness with knowledge of William's relationship with his parents. The Taylors did not depose her. They cite no authority for the proposition that surprise testimony coming from a disclosed witness amounts to a willful violation by the proponent of the testimony. Caiarelli had a reasonable excuse. Ainsworth did not disclose the conversation to Caiarelli's attorneys until she had already given some testimony and they were preparing her to continue her testimony on the next day. The trial court accepted that there had been no intentional hiding of information.

This record does not establish a willful violation, nor does it show the degree of prejudice that would justify excluding highly relevant testimony. There is no reason apparent on the record why it would not have been sufficient to permit defense counsel to depose Ainsworth that evening and have her complete her testimony later. See Deutscher v. Gabel, 149 Wn. App. 119, 125-30, 202 P.2d 355 (2009). Ainsworth was only the third witness. The witness who might contradict her account of the doorstep conversation, Emily Taylor, had not yet testified. When Emily did testify several days later, she admitted to having a

heated conversation with Caiarelli's sisters while cleaning out William's home but denied saying anything about daily, hour-long phone calls with William up until the day he died.[8]

We conclude it was error to exclude the Ainsworth testimony.

Other Evidence of Undue Influence

There was no direct evidence presented that Reuben himself talked to William during the four or five months leading up to William's transfer of ownership of the Northwestern Mutual policies. However, undue influence may also be proven by circumstantial evidence. In re Estate of Riley, 78 Wn.2d 623, 647, 479 P.2d 1 (1970). The record contained substantial circumstantial evidence from which the jury might have inferred that William had a long standing and continuing confidential relationship with his parents, that they were deeply involved in his financial affairs, and that he was susceptible to their influence.

Emily testified that not long after William and Caiarelli's separation in April 2003, she came out to Seattle several times to be with William and help him "get away from the deep sadness he had."[9] Exhibit 6, a set of police reports, shows that William was particularly distraught and erratic in behavior during the month of August 2003. William's business attorney, Jack Borland, twice reported to police that William was missing. On one occasion William was located at Harborview, where he had turned himself in. On another, he was found in Woodinville sleeping in his car.

---

[8] Report of Proceedings (Nov. 21, 2011 p.m.) at 86-87.
[9] Report of Proceedings (Nov. 21, 2011 p.m.) at 45.

Borland was in touch with Reuben and Emily.[10] He expressed to them his concern that William, despite being in the midst of a heated divorce, was making provisions for Caiarelli in his will.[11] Reuben and Emily came out to look after William. They stayed with him and contacted police twice about his behavior.

On August 29, 2003, Reuben called the police to report that William had taken Reuben's briefcase and would not return it. The police officer who responded reported that he "immediately recognized" that William "was not of sound mind." The officer persuaded William to return Reuben's briefcase. The police report states, "Reuben told me that he wanted the incident documented so that the Kirkland Police would have some insight into William's behavior if they were to come into contact with him in the future. Reuben told me that he would continue to work with William's lawyer and doctor in hopes that William would get the help he needs to regain emotional well-being."

Reuben called the police to William's house again three days later, September 1, 2003. The police report states that William was "very agitated and nervous upon contact. . . . William explained that his parents are trying to take control of his life and assets. He said that he knows he's experiencing difficulties and that he wants to work with his father, but his father is going about it the wrong way. He said that his father tried to leave with some important papers of

---

[10] Borland is the attorney who prepared William's first two wills. He later served as attorney for Charles when Charles was personal representative of the estate and at the same time represented Charles personally in this action. Clerk's Papers at 490.

[11] Report of Proceedings (Nov. 21, 2011 p.m.) at 52-53; see also exhibit 6 (Borland tells police that William's estate planning is "unusual" and he is "not thinking correctly.") In the wills prepared by Borland, William provided for Caiarelli to have an income equal to court-ordered child support and directed that she be allowed to live in his house, which was his separate property, if A.C.T. lived with her.

his today, and that he decided he'd take his father's luggage until he gave the papers back."[12]

Emily filed a petition for William's guardianship on September 4, 2003.[13] Emily declared her extreme concern for William's mental health and his financial actions.[14] Two weeks later, Emily hired and paid attorney Craig Coombs to help William defend himself against the guardianship. The guardianship was settled in November 2003. William signed a stipulation requiring him to give power of attorney to Charles (and alternatively, Reuben) to act for him if he disappeared.[15]

In 2004, there was a mediation in the dissolution action. Emily attended it. She came out to Seattle in December 2004 and stayed more than a month. She also attended almost every day of the dissolution trial. After the dissolution became final in February 2005, Emily talked on the phone with William as much as twice a week based on her own testimony.[16]

During Emily's trial testimony on November 21, 2011, she described William as independent and self-motivated and she professed a lack of knowledge about many of the details in the police reports. However, she also testified that she filed the guardianship petition in part because William's assets "were being used up very fast."[17] She acknowledged the statement in her declaration in support of the guardianship wherein she stated, "I seek . . . to mitigate the damages of my son's present incapacity by assisting with the

---

[12] Exhibit 6.
[13] Exhibit 7
[14] Exhibit 8.
[15] Exhibit 56.
[16] Report of Proceedings (Nov. 21, 2011 p.m.) at 57. Based on the Ainsworth testimony, the phone calls were daily and hour-long.
[17] Report of Proceedings (Nov. 21, 2011 p.m.) at 79.

temporary management of finances by paying bills and obligations that are now seriously past due, including the obligation to pay temporary child support." She testified, "We were willing to give him every help we could."[18] And she testified that through the entire period of the dissolution from 2003 to early 2005, she and Reuben gave William considerable financial assistance "when he seemed to need money or asked for it,"[19] including for health insurance coverage and a car. Although she characterized the money as "loaned" rather than "given," she also said that they "never discussed repayment at all."[20]

Reuben testified that he did not recall having discussions with William about estate planning. Reuben was the alternate on the power of attorney William gave to Charles in the stipulation ending the guardianship. William had named Reuben the alternate personal representative of his estate, the alternative trustee for A.C.T.'s testamentary trust, and the alternate guardian for A.C.T. if both Caiarelli and Charles were unable to serve. Reuben testified that he was unaware of these designations. The Taylors argue, without citing authority, that these instruments do not evidence a fiduciary relationship because the members of the Taylor family never invoked them. We disagree and hold that William's repeated designation of his family members to act as fiduciaries is evidence of the special confidence he placed in their advice.

Reuben also testified that he had given William business advice in the past and had loaned him money when he was unemployed. At the end of his

---

[18] Report of Proceedings (Nov. 21, 2011 p.m.) at 82.
[19] Report of Proceedings (Nov. 22, 2011 a.m.) at 57.
[20] Report of Proceedings (Nov. 22, 2011 a.m.) at 42, 47.

testimony Reuben was asked whether he could think of anyone in William's life besides the Taylor family that William trusted. His answer was "I can't name anyone specifically, no."[21]

In the trial court's view, Caiarelli's effort to establish the existence of a confidential relationship between William and his parents at the time he transferred the policies consisted solely of Emily's testimony that she occasionally talked to William on the phone and an inference that Emily must have talked to Reuben about William.[22] This is an overly constricted view of the evidence. A jury could reasonably infer that Reuben and Emily worked together to help William manage his finances and that he trusted their advice. A jury could also infer that Reuben and Emily believed their interference and influence was necessary to ensure that William put his assets under the control of the Taylor family. A jury could reasonably infer that that was one of the purposes for having Emily attend the mediation and trial of the dissolution.

In short, the evidence was sufficient to allow a jury to find the existence of a confidential relationship that would shift the burden to Reuben to prove that he did not unduly influence William.

Even if the jury did not find the existence of a burden-shifting confidential relationship, and the burden remained on Caiarelli to prove undue influence, the evidence was sufficient to present a jury question. Where a challenger can show a combination of suspicious facts and circumstances, a presumption against validity may arise. Dean v. Jordan, 194 Wash. 661, 671-72, 79 P.2d 331 (1938).

---

[21] Report of Proceedings (Nov. 22, 2011 p.m.) at 24.
[22] Report of Proceedings (Nov. 23, 2011) at 102-03.

22

If the presumption arises, it may be rebutted by the donee with "evidence sufficient at least to balance the scales and restore the equilibrium of evidence touching the validity of the will." Dean, 194 Wash. at 672.

How the jury could have applied this law to Reuben is illustrated by the instruction the trial court gave for the undue influence claim against Charles. Instruction 16 allowed the jury to consider eight factors drawn from Dean and similar cases:

> In deciding whether or not Charles Taylor exercised undue influence over William Ross Taylor when William Ross Taylor made his beneficiary designations, you may consider the following factors:
> (1) whether Charles Taylor occupied a fiduciary or confidential relationship to William Ross Taylor;
> (2) whether Charles Taylor actively participated in the preparation or designation of William Ross Taylor's life insurance beneficiaries or IRA beneficiary;
> (3) whether Charles Taylor received an unusually or unnaturally large part of the estate. You may also consider:
> (4) the age or condition of health and mental vigor of William Ross Taylor
> (5) the nature or degree of relationship between William Ross Taylor and Charles Taylor;
> (6) the opportunity for exerting an undue influence,
> (7) the naturalness or unnaturalness of the will. Whether a beneficiary designation is natural or unnatural is a question to be determined in each case as warranted by the facts. In the determination of the question of what is unjust or unnatural, the history of the donor's family is to be considered and the moral equities and obligations appearing therefrom. A gift or transfer is unnatural when it is contrary to what the donor, from his known views, feelings and intentions, would have been expected to make.
> (8) the availability or unavailability of independent advice.

The evidence presented at trial supports the majority of these factors with respect to Reuben:

- Confidential Relationship: The evidence supported this factor; see discussion above.

23

- Participation in Preparation of Documents: There is no direct evidence that Reuben participated in William's submission of the change of owner designation.

- Unusual or Unnatural Part of the Estate: Exhibit 203 is a pie chart that was admitted to give a rough idea of the distribution of William's assets. It showed that 53 percent went to Charles, 14 percent went to Reuben, 15 percent were assets deposited to the estate account, and 18 percent in other categories. The five policies paid out to Reuben had a total value of $204,000. A jury could conclude that Reuben received an unusual or unnatural part of William's assets.

- Condition of Health and Mental Vigor: A jury could find that William's mental health and vigor was at a low ebb considering his erratic behavior beginning in fall 2003 and extending through to his death.

- Relationship to Beneficiary: Reuben and Emily assisted William financially and emotionally, and there was no one else in his life he trusted more.

- Opportunity to Exert Undue Influence: Reuben and Emily worked in concert to make sure the assets William had accumulated did not get "used up" by Caiarelli. Emily spent a great deal of time with William personally during the dissolution proceedings and attended the mediation and the trial. Afterward, she was on the phone with him regularly.

- Naturalness of the Gift: The transfer of a valuable asset to his father, who did not need it, was unnatural considering he had a young son.

- Availability of Independent Advice: William could have obtained independent advice. Attorney Craig Coombs, who prepared the will, testified that he expected William to come back to revisit his estate plan when the dissolution was over and the distribution of property was final.

Not all of the factors need be present in order for undue influence to be established. See Dean, 194 Wash. at 671-72; In re Estate of Haviland, 162 Wn. App. 548, 560, 255 P.3d 854 (2011).

24

The record offers competing narratives of what was going in William's mind when he made a gift to Reuben of the five Northwestern Mutual policies. A jury could find that he independently decided to benefit Reuben rather than A.C.T. But a jury could also find that William was deeply troubled, increasingly isolated, and highly susceptible to the idea that transferring the assets to the Taylor family would ensure that they were held for the benefit of A.C.T. and out of the reach of his ex-wife. Evaluating this dispute presents factual questions. The task should not have been taken from the jury. We conclude the trial court erred by dismissing the undue influence case against Reuben at the end of the petitioner's case.

Exclusion of Reuben's Deposition Testimony

Caiarelli has assigned error to the exclusion of Reuben's deposition. Although resolution of the issue is not necessary to decide this appeal, we address it briefly in case it arises again on remand.

The deposition appears to have been included inadvertently in exhibit 28. Exhibit 28 includes evidence relating to the removal of Charles as personal representative of William's estate. The trial court's intention was to exclude such evidence because there was a settlement among the parties that resolved issues arising from Charles' mishandling of the estate. For unexplained reasons, exhibit 28 also included Reuben's deposition (which took place much later) and some other unrelated pieces of evidence. As Caiarelli points out, the settlement agreement does not justify the exclusion of Reuben's deposition. But the record does not demonstrate that the exclusion of Reuben's deposition was purposeful or that the problem was ever brought to the trial court's attention. The deposition

25

was published and portions of it were used during the examination of Reuben as a witness at the trial. Caiarelli fails to establish error. On remand, the parties are free to offer Reuben's deposition.

## DISMISSAL OF EMILY

We next address whether the trial court erred by dismissing William's mother Emily as a party to the case.

Emily was an alternate trustee of the testamentary trust William created for the benefit of A.C.T. Like Charles and Reuben, she did nothing to fulfill the duties of a trustee. Unlike Charles and Reuben, however, Emily did not personally receive proceeds from any account or policy at issue in the litigation. On this basis, she asked the court to dismiss her. The court agreed that Emily was not a necessary party.

In determining whether a party is necessary to an action, "the court must decide whether the party's absence from the proceedings would prevent the court from affording complete relief to the existing parties and whether the party's absence would impair that party's interest or subject any existing party to inconsistent or multiple liability." Cordova v. Holwegner, 93 Wn. App. 955, 961-62, 971 P.2d 531 (1999). Here, the court anticipated imposing a constructive trust over the disputed assets if the jury's verdict was for Caiarelli. The court reasoned that if Caiarelli prevailed in establishing a constructive trust over the assets at issue, she would be able to obtain complete relief even if Emily was not a party.[23]

---

[23] Report of Proceedings (Nov. 17, 2011) at 81-82.

In the present posture of the case, the only assets still at issue are the five Northwestern Mutual policies. Reuben purchased these policies for William one at a time beginning when he was in the third grade. Reuben and Emily were designated as the primary beneficiaries of the policies. Caiarelli contends Emily's status as a named beneficiary makes her an interested party and requires that she stay in the case. We agree.

The terms of the policies permitted the owner of the policy to change the beneficiary after the death of the insured. After William died, Reuben exercised this power and changed the beneficiaries from himself and Emily to just himself. The Taylors contend that if the transfer to Reuben is set aside on grounds of undue influence, Emily will remain a rightful beneficiary as she was before the transfer.[24] This contention alone shows that Emily must remain a party; if Reuben's ownership of the policies is set aside, she intends to claim an interest in the proceeds.

Caiarelli contends the transfer of ownership to Reuben was the product of undue influence by Reuben and Emily jointly to get William to put his assets under the control of the Taylor family where Caiarelli would not be able to get at them. The change of ownership did achieve that objective, as it was irrevocable. And there was ample circumstantial evidence that Emily and Reuben acted in concert with respect to their involvement in William's personal and financial affairs. Thus, Caiarelli contends that if the transfer was the product of undue influence by Emily and Reuben, any interest that either of them has in the

---

[24] Appellant's Reply Brief at 39.

proceeds should be subjected to a constructive trust on behalf of A.C.T., in accordance with the directive in William's will. This argument also supports keeping Emily in as a party, to ensure that the final order in the case will be enforceable against both Reuben and Emily.

We conclude the order dismissing Emily must be reversed.

Caiarelli requests an award of attorney fees and costs against Reuben and Emily for the cross appeal. The statute under which the action was brought permits an appellate court to award attorney fees. RCW 11.96A.150. When considering a fee request under a statute that authorizes an award of attorney fees to a prevailing party and further proceedings are necessary in the trial court to determine who will finally prevail, this court will often remand the request to the trial court and let the request abide the result there. But RCW 11.96A.150 is not a prevailing party fee statute. The discretion it affords is broad, permitting an award in such amount "as the court determines to be equitable" after considering any and all factors that the court "deems to be relevant and appropriate." RCW 11.96A.150. We exercise our discretion to order Reuben and Emily to pay Caiarelli's costs and reasonable attorney fees for the cross appeal. As between them and A.C.T., they have the greater ability to pay. It is equitable that they rather than he should bear the cost of reinstating them as parties. Their defense of the undue influence claim is not frivolous and they may yet prevail, but the record reflects that when they have had a choice between serving the interests of A.C.T. or their own interests, they have chosen their own interests. In these circumstances, the equities are with William's child, not with his parents.

28

The jury verdict is affirmed. The award of attorney fees against Charles is affirmed. The orders dismissing Reuben and Emily are reversed. Attorney fees are awarded against Charles for the appeal and against Reuben and Emily for the cross appeal.

_Becker, J._

WE CONCUR:

_Leach, J._                              _Lau, J._

29