IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SARA G. ARROYO, | ) | No. 31586-0-III |
| Respondent, | ) | |
| v. | ) | |
| GLORIA J. FISCHER, | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |

SIDDOWAY, C.J. — Gloria Fischer appeals the trial court's award to Sara Arroyo

of one-half the value of properties acquired during their committed intimate relationship,

determined as of the time the relationship ended. She argues that it was error for the trial

court to disregard an agreement and promissory note executed in connection with a 1978

property acquisition by the parties—an agreement and note that the court implicitly found

had been abandoned. She also challenges the trial court's posttrial decision to increase its

initial damage award by $3,768.26, arguing that the increase was a veiled award of

prejudgment interest to which Dr. Arroyo was not entitled. We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

Gloria Fischer was a professor at Washington State University (WSU) in 1972

when she met Sara Arroyo, a graduate student in her department. They began a

committed intimate relationship in 1973. Dr. Arroyo (at the time, "Ms. Arroyo") moved into Dr. Fischer's home in Pullman, Washington in 1974.

During the 10 to 11 years of their committed intimate relationship, the parties purchased a total of 4 properties, using one or both of the parties' money. The first was a home in Kennewick, Washington. Dr. Arroyo completed her Ph.D. in 1977, after which she completed a clinical internship at the University of Southern California Medical Center and then obtained her first job in Washington in the Tri-Cities, at the Regional Community Mental Health Center. The home in Kennewick was intended to be a long-term residence for the women and was purchased as joint tenants with rights of survivorship. It was Dr. Arroyo's principal home while working in the Tri-Cities and Dr. Fischer's part-time home; Dr. Fischer would arrive on Thursday evening and leave on Monday morning. Dr. Fischer was spending enough time with Dr. Arroyo in Kennewick that she rented out her Pullman home, moved into a trailer in Pullman, and moved most of her furniture to Kennewick. Dr. Fischer liked the Kennewick home, regarded it as her possible retirement home and, at the time, spoke of retiring soon, at age 55.

Dr. Fischer had paid the down payment for the home, while Dr. Arroyo made the mortgage payments. Before the purchase, Dr. Arroyo asked an acquaintance if he could notarize the real estate documents, and the acquaintance not only notarized the documents as needed but also prepared an agreement that would adjust the parties' contribution toward the cost of the property. Generally, the agreement he prepared

2

required Dr. Arroyo to make mortgage payments toward the property until her contribution equaled Dr. Fischer's; it further provided that proceeds of a sale of the property would be split. The acquaintance also prepared a companion promissory note. The parties signed both at the time the purchase of the Kennewick house closed in August 1978. Apart from Dr. Arroyo's making the mortgage payments while living in the home, the parties never performed the obligations contemplated by the documents.

Dr. Arroyo disliked her job in Kennewick. Having learned of other Ph.D.s in her field who had done well in the military, she decided to join the Navy. She left the Kennewick home in 1979 and after living temporarily with Dr. Fischer in Pullman, relocated to South Carolina, where she was stationed. Dr. Arroyo wanted to sell the Kennewick home—both then, and according to her, many times thereafter. But Dr. Fischer, who continued to regard it as a good investment, did not. Dr. Arroyo therefore agreed that they would continue to own it as a rental property. Initially, Dr. Arroyo made payments to a third party property manager to handle rental of the Kennewick home, but Dr. Fischer was dissatisfied with him and took over management herself. In the years thereafter, Dr. Fischer took responsibility for managing the rental. Dr. Arroyo would occasionally help Dr. Fischer with cleaning and repairs when she was in Washington State.

Once in South Carolina, Dr. Arroyo found a home that became the second property jointly purchased by her and Dr. Fischer. The two women split the cost of the

down payment and Dr. Arroyo made all the mortgage payments. During the three years that Dr. Arroyo was stationed in South Carolina, Dr. Fischer paid extensive visits. Dr. Arroyo testified that in her first year in South Carolina, Dr. Fischer visited only occasionally, but that in her second and third years of service, Dr. Fischer first took a one-year sabbatical and then took a second year leave of absence, living for those two years with Dr. Arroyo.[1] When Dr. Arroyo's service was completed, the parties sold the home for a small profit, which they split.

The third property purchased was a lot adjacent to Dr. Fischer's Pullman home that the parties purchased as joint tenants with rights of survivorship in May 1982. Dr. Fischer paid the entire purchase price of $9,600. By the time of the purchase, the parties had lived in a committed intimate relationship for nine years, so the funds used by Dr. Fischer could well have been community-like—but given the partnership theory on which Dr. Arroyo relied at trial, the character of the funds was never explored. Dr. Arroyo testified that she was in Pullman, visiting, in May 1982 when the Pullman property was purchased in both parties' names.

---

[1] Because Dr. Arroyo prevailed in the trial court, we view the evidence throughout this factual statement in the light most favorable to her. We note, however, that there was a major disagreement over the amount of time Dr. Fischer lived in South Carolina; Dr. Fischer testified that she lived there only one semester, which was both her sabbatical and a leave of absence.

Dr. Arroyo was discharged from the Navy in August 1982 and the Navy moved the parties' furniture and belongings back to Dr. Fischer's home in Pullman. Dr. Arroyo got a job at the Yakima Valley Farm Workers Clinic in Toppenish, almost 200 miles from Pullman. She continued to live with Dr. Fischer in Pullman on the weekends and commuted each week to work in Toppenish.

The fourth and final properties that the parties purchased together were rental units in California that they purchased as an investment, believing that the real estate market was good. Dr. Fischer contributed three-quarters of the down payment and Dr. Arroyo contributed a quarter; Dr. Arroyo estimated their contributions were $45,000 and $15,000, respectively. Dr. Arroyo's brother Ramon Arroyo was a real estate agent in California, assisted them in identifying the property, and was going to help them manage it. After the parties ended their relationship, Dr. Fischer became very dissatisfied with Mr. Arroyo's management and even lodged a complaint against him with the California department of licensure.

The parties separated in November 1983. Dr. Arroyo characterized the November 1983 date as when they separated "physically," because she had suggested that they take a year off from the relationship; she was tired of the commute and the two were having relationship problems. Report of Proceedings (RP) at 78. Two or three months later, though, Dr. Fischer asked that Dr. Arroyo return a ring she had given her years earlier, which Dr. Arroyo did.

During the 1973 to 1983 term of the relationship, the parties maintained a joint bank account for shared living expenses, although Dr. Fischer also maintained a separate bank account of her own. As the younger member of the couple and a graduate student, Dr. Arroyo had less resources. At one point in the trial, she responded to questioning implying that she had always benefited financially from the relationship, an example being that Dr. Arroyo was able to use Dr. Fischer's car. Dr. Arroyo testified that she never viewed herself as getting a "free ride," explaining:

> I bought several things for the house that I did not account to say Gloria pay me for this, I just, I mean there was just not . . . that was not the way I operated in any intimate relationship. Uh yes I drove her car. Uh I felt, in all honestly, that I deserved, if you wish, uh I used to clean the house, do the laundry, ironing, sewing, cooking, going to the market, taking her to her office, picking her up from the office, uh so I was uh the person that was really serving Gloria. Uh I'm saying this . . . I don't regret it, in my heart I don't regret. I just mention this because my God I mean if I cannot have her car to drive, to go to the market, to pick her up, I mean what can I have? Uh the other issue is also . . . I paid gasoline many, many, many times. Uh so no it was not a free ride. Gloria does not give a free ride.

RP at 136 (alterations in original).

After the parties separated, they agreed to sell the California property and split the proceeds on the same 75/25 percent basis of their contributions. The California property was sold in 1986. Dr. Arroyo testified that from the proceeds, Dr. Fischer was supposed to receive $56,240 and she was supposed to receive $18,750 but that Mr. Arroyo sent Dr. Fischer more than her share, with the expectation that Dr. Fischer would disburse Dr. Arroyo's entitlement to her. Dr. Arroyo testified that when she followed up and asked

Dr. Fischer for her share of the proceeds, Dr. Fischer responded that she "was not a bank." RP at 82. As of the 2012 trial, however, Dr. Arroyo did not have records from which she could demonstrate an incorrect distribution.

The parties continued to correspond about their two remaining jointly-owned Kennewick and Pullman properties thereafter. In February 1990, Dr. Fischer wrote to Dr. Arroyo, stating in part that "'I do want to take your name off the land by the home on Church,'" meaning the Pullman property. RP at 20. Later in the letter, she said, "'If you decide to sign off [on] the Church Street property only that's fine. If you decide to sign off on the Kennewick property as well and you feel you have money coming just let me know how much.'" *Id.*

In a letter to Dr. Fischer dated January 3, 1991, Dr. Arroyo wrote, "'I regret to tell you that I do not feel comfortable signing such documents prior to being compensated with the amount of $30,000.'" RP at 22. Elsewhere, she stated, "'I believe that I deserve this amount in view of the fact that I have never benefited from the tax breaks and rents collected during the past eleven to twelve years.'" *Id.* In a response dated January 4, Dr. Fischer wrote Dr. Arroyo to say, "'I will put [the Kennewick house] on the market and we will have to go to court and let the court decide who gets what.'" RP at 24. A January 10 reply from Dr. Arroyo stated, "'In your letter of last year (February 1990) you asked me to let you know how much money I wanted to cash me out of the business. I responded to your request.'" RP at 26.

7

Although Dr. Fischer produced no further evidence of correspondence during this time frame from Dr. Arroyo, she later used a purported quitclaim deed from Dr. Arroyo, dated March 21, 1991, to eliminate Dr. Arroyo's interest in title to the Pullman property. At trial, Dr. Arroyo denied that the signature on the quitclaim deed was hers. Dr. Arroyo offered and the trial court admitted records of motel and restaurant charges supporting Dr. Arroyo's testimony that she and a friend had driven to California for job interviews in March 1991, and were in Los Angeles on March 21, 1991. The only handwriting expert called to testify at trial expressed his opinion that there was a strong probability that Dr. Arroyo's purported signature on the quitclaim deed was a forgery.

When examined at trial as to when she acquired the quitclaim deed, Dr. Fischer testified, "I really don't remember, it just came in the mail and I saw her signature and took it to my attorney." RP at 27. She testified that the quitclaim deed was not accompanied by a letter, "It just appeared in the mail." *Id.*

Dr. Arroyo's purported signature on the deed had been notarized by Sarah Gilman, who was deceased by the time of trial. Ms. Gilman, a former graduate student at WSU, had traveled to the university with Dr. Fischer from the University of South Florida in the 1970s or 1980s and had finished her education at WSU, living with Dr. Fischer. Dr. Fischer testified that she and Ms. Gilman had stayed in touch. The notarial jurat indicated that Ms. Gilman notarized Dr. Arroyo's signature on March 30, 1991, yet Dr. Fischer admitted that Ms. Gilman was living in Washington, D.C. at that time.

8

When asked if she did not think it was odd that the deed would appear with no explanation and notarized as it was, Dr. Fischer answered, "I didn't pay any attention to the notarization; if I had I would have realized that something was wrong. I mean who looks at a notary? I saw . . . I looked . . . I knew what the paper was, I saw the signature, I had expected her to sign that paper [and] assumed she had." RP at 31 (first two alterations in original).

Dr. Arroyo and Dr. Fischer corresponded further in 2004 and 2005 about the Kennewick house. In a letter to Dr. Fischer dated February 8, 2005, Dr. Arroyo suggested that the two women either share the proceeds of the Kennewick house or that one or the other buy the other party out.

Dr. Fischer sold the Pullman property in 2006. There was no evidence suggesting that Dr. Arroyo was aware of the sale, and she denied any knowledge of it. By the time the Pullman property was sold, Dr. Fischer had built a duplex on it, at a cost of between $200,000 and $250,000. The property was sold for a total sales price of $329,900.

In 2010, Dr. Arroyo retained a lawyer, who wrote Dr. Fischer in November 2010 to demand an accounting of the income and expenses for the Kennewick house, to ask for Dr. Fischer's cooperation in selling the house, and to inform Dr. Fischer that Dr. Arroyo had learned of the purported 1991 quitclaim of the Pullman property and claimed that it was a forgery. When the parties' disputes were not resolved, Dr. Arroyo brought suit against Dr. Fischer in June 2011, alleging that the parties had formed a partnership in

1978 to own and manage real estate that lasted until they separated in 1983. The complaint sought an accounting of the income and expenses for the Kennewick and Pullman properties and a winding up of the partnership.

In her answer to the complaint, Dr. Fischer denied the existence of a partnership and asserted that their rights and obligations with respect to the Kennewick house were governed by the 1978 agreement and promissory note, which Dr. Arroyo had failed to perform and pay.

A bench trial of the matter took place in December 2012. At the conclusion of the trial, the court made a partial decision, announcing "the outline or the structure of how I'm going to decide the case." Clerk's Papers (CP) at 13. As the court explained:

> I agree that there are many legal theories that I've heard argued here that probably could form a basis for the Court's decision.
> But one thing just jumps out at me and I feel controls the decision that I make and I'm applying . . . current law, not the antiquated law that was in effect at the time the parties had the relationship primarily because I feel that's what I'm required to do but because I feel that would reach a most fair and equitable result in the case. . . .
> . . . [T]he California property and the South Carolina property and the nature of the relationship with respect to those properties gives me some background and does have an influence on the decision I make, but what we're really talking about in this dispute is the Kennewick property and the lot in Pullman. These properties were acquired by the parties at a time when very clearly here and really [i]ndisputably—this is one of the few areas you're not differing on—you were involved in a committed close domestic relationship, one that wasn't recognized back then by the law. . . .
> [A]s I heard the testimony from both of the parties here, this wasn't a business. . . . You two might have had, like married couples do, entered into this with a view of geez, we want to improve our career status and we want to make money and things of that nature, but this was an intimate

10

relationship here. This relationship was based upon feelings for one another. It wasn't based upon dollars and cents. I heard Ms. Fischer testify as to how devastated she was after the breakup. I heard Ms. Arroyo testify as to her feelings here and like any other personal relationship that results in people living together and combining not just their assets and their finances, but their efforts and driving to go get the groceries and to do laundry and housework and providing—one party more the breadwinner while the other party is going to grad school and things—again, this is not a business partnership or that is not how I see it here.

This was an 11-year committed relationship and when the property was purchased down in the Tri-Cities-Kennewick—even though [the acquaintance] got involved and drew up some papers that would be in the nature of a business transaction or a partnership, it's very clear because of the personal nature of your relationship here, you never followed it. You never lived by it. You never recognized it. I think for the most part until this dispute came about both of you forgot it. You didn't purchase—I'm talking to both of you when I say you—that Kennewick property for the purpose of making money.

CP at 13-15. The court told the parties that it would be deciding the case by applying something similar to community property principles and anticipated awarding each party one-half of the equity in the Kennewick and Pullman properties as of the date of separation. It also announced that because it felt "very clearly" that the Pullman quitclaim deed was forged, and because the forgery complicated the case, it would award a portion of Dr. Arroyo's attorney fees and costs. CP at 18.

The court thereafter awarded Dr. Arroyo $18,425.00, which it found to be one-half the equity in the two properties at the time of separation, and $18,419.26, which was the total of Dr. Arroyo's attorney fees and costs. It explained that while it had originally intended to award Dr. Arroyo only fees and costs attributable to the forged quitclaim

deed, "[u]pon further consideration," it concluded that she was entitled to an additional

amount, given that Dr. Arroyo had been deprived of the use of her financial interest in the

property for 30 years, and that Dr. Fischer had "gained substantially from the effects of

inflation on property values over this time." CP at 47. The additional amount awarded

was enough to fully compensate Dr. Arroyo for her attorney fees and costs.

Dr. Fischer appeals.

## ANALYSIS

Dr. Fischer assigns error to (1) the trial court's implicit finding or conclusion that

the 1978 agreement and promissory note signed by the parties were either abandoned or

otherwise unenforceable and (2) its award of attorney fees and costs because Dr. Arroyo

had "been deprived of the use of her monetary interest in the property for 30 years,"

which she argues is an unpermitted award of prejudgment interest on a nonliquidated

claim. *Id.* We address the assignments of error in turn.

*I. Implicit rejection of 1978 agreement and promissory note.*

Dr. Fischer assigns error to the trial court's implied finding that the 1978

agreement and note were of no effect and to the court's failure to enter a conclusion of

law indicating why the agreement and note were unenforceable. The trial court's written

findings and conclusions made no mention of Dr. Fischer's position that the parties'

rights and obligations with respect to the Kennewick property were governed by the 1978

agreement and promissory note. It thereby implicated the common law rule that the

12

absence of a finding on a material issue is presumptively a negative finding against the person with the burden of proof. *See, e.g., McCutcheon v. Brownfield*, 2 Wn. App. 348, 356, 467 P.2d 868 (1970). The trial court's oral partial ruling shed light on why it found no contractual rights or obligations, when it said of the 1978 written agreement, "It's very clear because of the personal nature of your relationship here, you never followed it. You never lived by it. You never recognized it. I think for the most part until this dispute came about both of you forgot it." CP at 15.

Review of a bench trial is limited to determining "whether the findings of fact are supported by substantial evidence and, if so, whether the findings support the conclusions of law and the judgment." *City of Tacoma v. State*, 117 Wn.2d 348, 361, 816 P.2d 7 (1991). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise. *In re Marriage of Lutz*, 74 Wn. App. 356, 370, 873 P.2d 566 (1994). "The party challenging a finding of fact bears the burden of showing that it is not supported by the record." *Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc.*, 102 Wn. App. 422, 425, 10 P.3d 417 (2000).

"A contract will be treated as abandoned where the acts of one party inconsistent with its existence are acquiesced in by the other." *Ferris v. Blumhardt*, 48 Wn.2d 395, 402-03, 293 P.2d 935 (1956). In determining whether the parties to a contract have abandoned their agreement, "the existence of mutual intent to discontinue performance is dispositive." *Martinson v. Publishers Forest Prods. Co.*, 11 Wn. App. 42, 50, 521 P.2d

233 (1974). A court determines whether a contract has been abandoned "based upon the facts and circumstances surrounding the transaction." *Id.* at 49.

Both parties' conduct was inconsistent with the 1978 agreement and promissory note. Dr. Arroyo testified that she forgot about them. She never made any payments on the note, and she stopped making payments on the mortgage when she moved out of the Kennewick home with a view to joining the Navy. Dr. Fischer acquiesced in Dr. Arroyo's discontinued performance of the agreement and note. In the 33 years that followed their execution before Dr. Fischer filed her answer to the complaint, Dr. Fischer never took action to enforce the agreement or note and never identified either as a basis for the parties' rights and obligations with respect to the property.

Dr. Fischer nonetheless points to her reference in a 1991 letter to a $10,000 loan that Dr. Arroyo had not paid back and her trial testimony that when she left in 1979, Dr. Arroyo orally agreed to transfer full ownership in the Kennewick house to her. Dr. Arroyo denied that she had ever agreed to transfer ownership in 1979 and Dr. Fischer's evidence was also contradicted by her own inconsistent conduct of acknowledging Dr. Arroyo's interest in the Kennewick property in the parties' 1990 correspondence and thereafter. Dr. Fischer testified at trial that she never forgot about the terms of the 1978 agreement and note, but she was impeached on this point with testimony from her pretrial deposition. During her deposition, she had been asked if the 1978 agreement looked familiar to her, to which she responded, "'No I don't remember this at all.'" RP at 16.

14

The trial evidence also established that before purchasing the Kennewick property, Dr. Fischer had never insisted on the arrangement reflected in the two documents; it was Dr. Arroyo's idea to have her acquaintance prepare an agreement for their signatures. Dr. Fischer denied "know[ing] anything about" the agreement and note before she was asked to sign the agreement. RP at 12. The fact that the arrangement was never required by Dr. Fischer makes it more likely that she would acquiesce when Dr. Arroyo's obligations under the documents were not performed.

In reviewing a trial court's decision to determine whether substantial evidence supports its findings, we defer to its credibility determination and we do not reweigh evidence. *Keene Valley Ventures, Inc. v. City of Richland*, 174 Wn. App. 219, 224, 289 P.3d 121, *review denied*, 178 Wn.2d 1020 (2013). Viewing the evidence in the light most favorable to Dr. Arroyo, there was ample evidence from which the trial court could find that Dr. Arroyo's early cessation of performance under the agreement and promissory note was acquiesced in by Dr. Fischer. Substantial evidence supported the trial court's conclusion that, having been abandoned, the agreement and note were unenforceable.

The trial court was thereby left to resolve the parties' rights based on their joint ownership of the two properties and the facts and circumstances under which they acquired and continued to own them. Apart from challenging the trial court's disregard of the abandoned agreement and note, Dr. Fischer does not challenge the trial court's

reliance on the equitable principles pertaining to committed intimate relationships as a basis for resolving the parties' property interests.

## *II. Attorney fees and costs.*

In announcing its partial ruling, the trial court stated that it would award Dr. Arroyo's fees and costs attributable to her claim that the quitclaim deed to the Pullman property was forged, having concluded that Dr. Fischer participated in the forgery. Dr. Arroyo submitted billing records and declarations claiming that $14,651.00 of the fees and costs she had incurred related to the forged deed.

The trial court nonetheless awarded Dr. Arroyo the full $18,419.26 measure of the fees and costs she had incurred—although not as fees, but as a convenient measure of an equitable addition to Dr. Arroyo's share of the value of the two properties. In its memorandum decision, the trial court explained its reasons for modifying and increasing its award to Dr. Arroyo:

> After trial, the court announced that it would make an award of attorney's fees in favor of Arroyo because of Fischer's dishonesty relating to the forged deed to the Pullman property. The court felt that reimbursement for a portion of her attorney fees was appropriate in this equitable action given the egregious nature of Fischer's conduct. The court has since reviewed the time and cost records of Arroyo's attorneys, and it finds these charges and expenditures reasonable.

CP at 47. It continued:

> Upon further consideration, the court also feels that some consideration should be given to the fact that Arroyo has been deprived of the use of her monetary interest in the property for 30 years, and that Fischer has gained

16

substantially from the effects of inflation on property values over this time. Because no evidence was presented to assist the court in quantifying these factors, the court deems it appropriate to make an adjustment in its oral ruling and to award Arroyo the full amount of her attorney fees and costs to date of $18,419.26.

*Id.*

Dr. Fischer argues that the additional $3,768.26 awarded is an improper award of prejudgment interest. Dr. Arroyo responds that the additional amount was not interest, but attorney fees, all of which could be justified on the basis of Dr. Fischer's egregious conduct.

While the trial court might have decided to award more attorney fees on the basis of Dr. Fischer's conduct, it is clear from a fair reading of his memorandum decision that he was not awarding the amount as additional attorney fees on that basis, but instead as an addition to her share of the property value.

Focusing on the trial court's language, we believe that it had in mind two things revealed before and during trial. The first was the material amount Dr. Fischer had realized from her sale of the properties, which Dr. Arroyo hoped would be the basis of her recovery. The evidence established that Dr. Fischer realized a profit of between $79,000 and $129,000 from her sale of the Pullman property (albeit after building a duplex on the property following the end of the parties' relationship). The record reveals that the Kennewick property had not only been profitable as a rental property (the trial court's unchallenged finding was that it had generated net rental income of $23,519.92

17

before being sold) but also that the net proceeds from its sale, which had been paid into court, had been "$110,000 and some change." RP at 91.

The second fact that the court had in mind was that Dr. Arroyo had asked repeatedly that the Kennewick property, at least, be sold. She testified that she had first wanted it sold when she joined the Navy. Her correspondence with Dr. Fischer in the 1990s and in 2005 reflects her continuing suggestion that it be sold or that she at least be allowed to receive her equity in the property by buying out Dr. Fischer's interest or by being bought out by Dr. Fischer.

The manner in which the court chose to resolve Dr. Arroyo's interest was to award her one-half the equity in the two properties as of the end of the parties' relationship in 1983. But Dr. Arroyo did not get her $18,425 in 1983, so that she could invest it and see it appreciate. She got it 30 years after the fact. In the meantime, the $18,425 that Dr. Fischer was spared from sharing when the parties separated had grown for 30 years, to her benefit. We believe it is this inequity that the trial court recognized at the time of its memorandum decision, leading it to conclude that some "[c]onsideration should also be given to the fact that Arroyo has been deprived of the use of her monetary interest in the property for 30 years, and that Fischer has gained from the effects of inflation." CP at 61. The real question raised by this assignment of error is whether the trial court had authority to award Dr. Arroyo more than 50 percent of the date-of-separation equity to

18

account for its finding that she had been harmed, and Dr. Fischer had been enriched, by the 30-year delay.

Dr. Fischer argues that the court did not have authority to increase Dr. Arroyo's entitlement because it is well settled that "[p]rejudgment interest is not properly allowed if the amount of the claim is determinable only through a standard of reasonableness as contrasted with a fixed standard." 14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 35:13, at 499 (2d ed. 2009). While the additional award was interest-like (although at an extraordinarily low rate), the trial court did not call the additional award "prejudgment interest" and it did not arrive at the amount as one would arrive at a measure of prejudgment interest, which would be by determining the principal amount of damages and applying the interest rate provided by statute. Because the trial court resolved the parties' interests based upon equity in view of their committed intimate relationship, the court was not engaged in a process of determining damages to which it added interest, it was engaged in a process of determining a "just and equitable division." Increasing Dr. Arroyo's amount based on a consideration of the detriment to Dr. Arroyo and benefit to Dr. Fischer of the delayed property division was a legitimate step in arriving at the principal amount of her entitlement; it was not an add-on.

RCW 26.09.080, which we look to for guidance in dividing property following a committed intimate relationship, "does not mandate an equal division of property. Rather, it requires a 'just and equitable' division." *In re Marriage of Martin*, 22 Wn.

19

App. 295, 298, 588 P.2d 1235 (1979). In *In re Meretricious Relationship of Sutton*, 85 Wn. App. 487, 933 P.2d 1069 (1997), this court recognized that one party's use of community-like real property following the end of a relationship was a factor the court could take into consideration in arriving at a just and equitable division of property. An abuse of discretion in dividing property exists only if it can be said that no reasonable person would have ruled as the trial court did on the facts before it. *In re Marriage of Pilant*, 42 Wn. App. 173, 176, 709 P.2d 1241 (1985). That is not the case here; the trial court had a reasonable basis for making the adjustment.

### III. Attorney fees on appeal.

Dr. Arroyo requests attorney fees on appeal, asking that we award attorney fees based on the same equitable grounds that led the trial court to do so below. Under RAP 18.1(a), attorney fees may be awarded on appeal only if applicable law grants a party the right to recover reasonable attorney fees or expenses on review.

On appeal, Dr. Fischer has not continued to deny wrongdoing but has conceded that the evidence could support the trial court's finding of dishonest conduct and its consequential award of fees. The equitable exception that justified the trial court's award is not implicated on appeal. The request for fees is denied.

No. 31586-0-III
*Arroyo v. Fischer*

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the

Washington Appellate Reports but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Lawrence-Berrey, J.

21